Filed 7/15/20

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| GERAWAN FARMING, INC., <br><br> Petitioner, <br><br> v. <br><br> AGRICULTURAL LABOR RELATIONS BOARD, <br><br> Respondent; <br><br> UNITED FARM WORKERS OF AMERICA, <br><br> Real Party in Interest. | F077033 <br><br> (44 ALRB No. 1, <br> 2012-CE-041-VIS, <br> 2013-CE-007-VIS <br> & 2013-CE-010-VIS) <br><br><br> **OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of review.

Irell & Manella, David A. Schwarz; Barsamian & Moody, Ronald H. Barsamian and Patrick S. Moody; Michael P. Mallery, for Petitioner.

Santiago Avila-Gomez, Todd M. Ratshin and Laura F. Heyck for Respondent.

Martinez Aguilasocho & Lynch and Mario Martinez for Real Party in Interest.

-ooOoo-

This writ proceeding addresses a decision by the Agricultural Labor Relations Board (ALRB or Board) that agricultural employer Gerawan Farming, Inc. (Gerawan) committed unfair labor practices by (1) engaging in bad faith "surface bargaining," and (2) insisting on the exclusion of workers employed by farm labor contractors (FLC workers) from the core benefits of any collective bargaining agreement (CBA) reached between Gerawan and the United Farm Workers of America (UFW or Union). The Board's findings were based on Gerawan's bargaining conduct both before and after the Board ordered the parties to "mandatory mediation and conciliation" (MMC) under the MMC statutory scheme, Labor Code section 1164 et seq.[1] To remedy these violations, the Board awarded make-whole relief for the period January 18, 2013, to June 30, 2013.

Gerawan contends (1) the MMC statute does not authorize the Board to impose unfair labor practice liability for its bargaining conduct within the MMC process, (2) the Board lacks the power to impose make-whole relief when a party is engaged in MMC, and (3) the Board's unfair labor practice findings are erroneous, arbitrary, and unsupported by substantial evidence. Gerawan also contends the Board erred when it denied its prehearing motion to disqualify one of the Board members who participated in this proceeding. Finding no merit to Gerawan's arguments, we affirm the Board's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

Gerawan, a family owned farming business, is the largest tree fruit grower in California. In addition to growing and harvesting tree fruit such as peaches, nectarines, plums and apricots, Gerawan grows and harvests table and wine grapes. Gerawan's extensive farming operations are conducted on thousands of acres of farmland in two

---

[1] The MMC statute is part of the Alatorre-Zenovich-Dunlap-Berman Agricultural Labor Relations Act of 1975 (Lab. Code, §§ 1140–1166.3) (the ALRA or the Act). Undesignated statutory references are to the Labor Code.

main locations: the west side ranches in the Kerman area, and the east side ranches in the Reedley/Sanger area.

Gerawan classifies its direct-hire employees as either "cultural" or "crew" labor. Cultural labor, which generally works year round, includes jobs such as water truck and tractor drivers, mechanics, irrigators, and nursery workers, while crew labor performs seasonal work such as harvesting and pruning. When Gerawan needs more workers, it often obtains them through farm labor contractors, whose employees perform the same work as crew labor. In 2013, Gerawan employed about 5,000 workers annually in both seasonal crew and year-round cultural jobs, and hired between 800 and 1,500 agricultural employees through farm labor contractors.

The UFW is a labor organization within the meaning of section 1140.4, subdivision (f). In 1992, following a contested runoff election, the Board certified the UFW as the exclusive bargaining representative of Gerawan's agricultural employees. It appears the parties held one in-person negotiating session in February 1995, but they never entered into a CBA.

### The Union Reappears and Negotiations Begin

No further bargaining occurred for the next 17 years until UFW National Vice President Armando Elenes sent Gerawan a letter on October 12, 2012, asking to recommence negotiations. Elenes asked Gerawan to provide 10 categories of information for Gerawan's agricultural employees, which included: (1) employee lists for all direct-hire and FLC workers for the 2011 and 2012 seasons, indicating, among other things, their hire dates, wage rates, and physical and mailing addresses; (2) names, addresses and license numbers of any farm labor contractors Gerawan used; (3) a detailed summary of any benefits, vacation pay, bonuses, holidays, piece rates and wages provided to employees for 2010 through 2012; and (4) copies of any current employee manuals or policies. Elenes proposed to start negotiations at the beginning of December. After receiving no response, Elenes sent a second letter on October 30, 2012, which repeated

3.

the Union's request to begin negotiations and for the information. Elenes threatened to file an unfair labor practice (ULP) charge with the ALRB if he failed to receive a response within five days.

Gerawan responded on November 2, 2012, by a letter signed by Gerawan's owners Ray, Mike and Dan Gerawan. They stated they were putting the requested information together, but after not hearing anything from the Union for over 20 years, they needed time to review the renewed demand to bargain and determine Gerawan's bargaining obligation, if any. They questioned how to explain to their employees, most of whom did not participate in the election, that they would "now have a contract and dues thrust upon them by a union they never voted for and who abandoned them 20 years ago." Nevertheless, Gerawan stated it would send information in the "next week or so" and have an attorney contact Elenes to schedule negotiations. Gerawan produced some of the requested information in December 2012.

### Pre-MMC Negotiations

Gerawan and the UFW met for their first negotiation session on January 17, 2013. Eight more sessions were held over the next two months.[2] Throughout the negotiations, the lead negotiators were attorney Ronald Barsamian for Gerawan and Elenes for the UFW. The UFW provided its initial contract proposal at the first session, while Gerawan presented its initial contract proposal at the second session on January 18, 2013. Before March 29, 2013, Gerawan and the UFW each made four other contract proposals. The UFW did not make any economic proposals during this time.

In March 2013, Gerawan announced hourly pay raises through a series of flyers, which indicated the decisions to grant pay raises were from "Ray, Mike, and Dan Gerawan," and claimed Gerawan consistently paid higher wages than other companies in the industry. The flyers did not credit the UFW for these pay raises; rather, they

---

[2]     Sessions were held on January 18, 2013; February 12, 13, 27, and 28, 2013; and March 19, 21 and 28, 2013.

expressed the raises were solely Gerawan's decision and noted the Union was informed of the "proposed plan, and we assume they will not cause any unnecessary delay." The UFW accepted the proposed wage increases. At that point, the Union had not made a wage proposal, as it was waiting for some outstanding items it had requested.

### *Negotiations During MMC*

On March 29, 2013, the UFW asked the ALRB to direct the parties into MMC, which the Board did on April 16, 2013. (*Gerawan Farming*, *Inc.* (2013) 39 ALRB No. 5.) On April 2, 2013, while the UFW's request was pending before the Board, Gerawan and the UFW engaged in a negotiation session. After being ordered into MMC, the parties selected a mediator, Matthew Goldberg, who was appointed in May 2013. Goldberg provided available dates for the mediation and the parties agreed to meet with him on June 6 and 11, 2013, when off-the-record MMC sessions were held.

At the mediator's request, Gerawan and the UFW continued to negotiate outside the mediator's presence while the MMC process was ongoing. The parties met on June 3, 2013, before the first MMC session. Gerawan presented a revised proposal to the UFW, while the UFW prepared a matrix which compared the parties' positions. Thereafter, the parties held bargaining sessions on July 1, 24 and 29, 2013, outside the mediator's presence. The UFW made its first economic proposal on July 21, 2013. The parties subsequently exchanged matrixes which set out the parties' proposals and supporting arguments on those terms they had not reached an agreement.

### *On-The-Record MMC Proceedings and Resulting CBA*

The mediator conducted two days of on-the-record MMC proceedings on August 8 and 19, 2013. As the parties were unable to voluntarily agree to all terms of a CBA, Goldberg issued a report to the Board on September 28, 2013, which fixed the CBA's terms.[3] (*Gerawan Farming*, *Inc.* (2013) 39 ALRB No. 16, p. 1.) Gerawan

---

[3] Gerawan has asked us to take judicial notice of the mediator's September 28, 2013 report in ALRB Case No. 2013-MMC-003, as well as the following documents filed in other judicial proceedings: (1) the UFW's opposition to ex parte application for stay of

petitioned for review of Goldberg's report, which the Board granted as to several terms. The Board remanded the matter to Goldberg in accordance with section 1164.3, subdivision (c). The parties met with Goldberg and reached agreement on the remanded terms, which Goldberg incorporated into a second report dated November 6, 2013. (*Gerawan Farming*, *Inc.* (2013) 39 ALRB No. 17, p. 2.) No party requested review of the second report and the Board ordered it to take effect as a final order of the Board.

Gerawan petitioned for review of the Board's order, contending, among other things, that the MMC statutory scheme was unconstitutional. While this court agreed the MMC statute was unconstitutional, the California Supreme Court held "the MMC statute neither violates equal protection nor unconstitutionally delegates legislative power." (*Gerawan Farming*, *Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1130 (*Gerawan Farming I.*).) The court also held "that employers may not refuse to bargain with unions—whether during the ordinary bargaining process or during MMC—on the basis that the union has abandoned its representative status." (*Id.* at p. 1131.) The court remanded the matter to us with instructions to conduct further proceedings consistent with its opinion. (*Id.* at p. 1160.)

---

administrative order pending review and the declarations of Giev Kashkooli and Armando Elenes, filed on May 24, 2013, in *Gerawan Farming, Inc. v. Agricultural Labor Relations Board*, Fresno County Superior Court case No. 13CECG01408; (2) complaint for defamation, filed on February 15, 2013, in *Gerawan Farming, Inc. v. United Farm Workers of America*, Fresno County Superior Court case No. 13CECG00495; and (3) petition for writ of review of order of Agricultural Labor Relations Board, filed on December 16, 2013, in *Gerawan Farming, Inc. v. Agricultural Labor Relations Board*, Fifth District Court of Appeal case No. F068526.

We take judicial notice of the mediator's report, as it was before the Board and considered by it in rendering its decision on review in this case. With respect to the court documents, we take judicial notice of these documents as "[r]ecords of … any court of this state." (Evid. Code, § 452, subd. (d)(1).) We do not, however, take judicial notice of the truth of any factual assertions appearing in the documents. (*Arce v. Kaiser Foundation Health Plan*, *Inc.* (2010) 181 Cal.App.4th 471, 483; see *Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1396 ["We can take judicial notice of the fact the pleadings were filed, but not of the truth of the statements contained in them."].)

*The Underlying ULP Charges and Administrative Hearing*

During the course of negotiations, the UFW filed a number of ULP charges against Gerawan. As pertinent here, the Board's general counsel issued complaints that encompassed three of those charges the UFW filed in 2012 and 2013. The charges were later consolidated into a third amended complaint (complaint), which became the operative pleading. The complaint alleged, as relevant here, that Gerawan violated section 1153, subdivision (e) by (1) engaging in bad faith surface bargaining, and (2) "proposing and insisting" on the exclusion of FLC workers from the terms of any CBA reached between the UFW and Gerawan. The parties stipulated the complaint was limited to bargaining conduct up to August 31, 2013.

An administrative law judge (ALJ) held a two-day hearing on the complaint in November 2016, at which Elenes and Barsamian testified. The parties entered into a written joint stipulation by which the parties stipulated to certain facts, as well as the authenticity and admissibility of 62 joint exhibits, which the ALJ received into evidence. The joint exhibits included Gerawan's and the UFW's correspondence, bargaining notes, and contract proposals, as well as several matrices summarizing their positions on various proposals. The ALJ issued a decision and recommended order on April 14, 2017, sustaining both allegations and ordering, among other things, make-whole relief from January 18, 2013, to June 6, 2013, the date of the first MMC session.

Gerawan, the UFW and the Board's general counsel all filed exceptions to the ALJ's decision. On January 22, 2018, the Board issued its decision and order, in which it affirmed the ALJ's factual findings and legal conclusions. The Board found the imposition of make-whole relief was appropriate, but extended the make-whole relief to June 30, 2013, the day before the effective date of the MMC contract.

*The Decertification Election and Subsequent Proceedings*

Meanwhile, the Board conducted a decertification election at Gerawan on November 5, 2013, after a majority of Gerawan workers petitioned the Board to hold an

election to decide whether the UFW would remain their certified bargaining representative. The Board impounded the ballots, subject to postelection proceedings to determine whether to set aside the election based on the UFW's objections. (*Gerawan Farming*, *Inc.* (2013) 39 ALRB No. 20, pp. 1, 47–48.) In April 2016, the Board nullified the decertification election as a remedy for Gerawan's purported unfair labor practices related to the election. (*Gerawan Farming*, *Inc. v. Agricultural Labor Relations Bd.* (2018) 23 Cal.App.5th 1129, 1141 (*Gerawan Farming II*); *Gerawan Farming*, *Inc.* (2016) 42 ALRB No. 1.)

Gerawan petitioned for review of the Board's decision, challenging the Board's unfair labor practice findings and the remedy of setting aside the election. (*Gerawan Farming II*, *supra*, 23 Cal.App.5th at p. 1141.) In *Gerawan Farming II*, which was filed on May 30, 2018, we concluded the Board erred in several of its unfair labor practice findings as well as in the legal standard applied in reaching its remedial conclusions. Accordingly, we partially set aside 42 ALRB No. 1 and remanded the matter to the Board to reconsider its election decision under the appropriate standard. (*Gerawan Farming II*, *supra*, 23 Cal.App.5th at p. 1141.)

On September 27, 2018, the Board certified the results of the decertification election, in which a majority of valid ballots were cast for "No Union," in *Gerawan Farming*, *Inc.* (2018) 44 ALRB No. 10, pages 11-12. Under established Board precedent, the UFW's decertification dates back to November 5, 2013, the date of the election. (*Gerawan Farming*, *Inc.* (2018) 44 ALRB No. 11, p. 13.) In light of the Union's decertification, we concluded the remaining issues raised in Gerawan's petition for review of the Board's order approving the terms of the MMC contract, which included additional constitutional challenges to the MMC statute and the retroactive wage increases the Board's order imposed, were moot and we dismissed that proceeding.

## DISCUSSION

### I. Standard of Review

We set forth the standard of review in *Gerawan Farming II*: "When reviewing questions of fact, we uphold the Board's findings if supported by substantial evidence on the record considered as a whole. [Citations.] Under this standard: '[W]e do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so.' [Citation.] 'Furthermore, those findings and conclusions that are within the Board's realm of expertise are entitled to special deference. [Citation.] And, because the evaluation of witnesses' credibility is a matter particularly for the trier of fact, the Board's findings based on the credibility of witnesses will not be disturbed unless the testimony is "incredible or inherently improbable." ' " (*Gerawan Farming II*, *supra*, 23 Cal.App.5th at p. 1162.)

This does not mean we take a "rubber stamp approach to our review of the Board's factual findings." (*Gerawan Farming II*, *supra*, 23 Cal.App.5th at p. 1162.) We measure the test of substantiality based on the " ' "*entire* record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence." ' " (*Ibid.*) " ' "Substantial evidence" is not established by just "any evidence" [citation] and is not shown by mere suspicions of unlawful motivation [citation]. The burden of proving unlawful conduct is on the ALRB [citation], and such conduct will not lightly be inferred [citation]. The standard of review is met, however, if there is relevant evidence in the record which a reasonable mind might accept in support of the findings.' " (*Ibid.*)

Where, as here, "the Board is called upon to draw inferences from the parties' conduct during negotiations, the standard for court review of the Board's determinations is deferential." (*William Dal Porto & Sons, Inc. v. Agricultural Labor Relations Bd.* (1984) 163 Cal.App.3d 541, 548 (*Dal Porto*).) As the Ninth Circuit Court of Appeals

9.

explained in *Penasquitos Village*, *Inc. v. NLRB* (9th Cir. 1977) 565 F.2d 1074:[4]

"Deference is accorded the [National Labor Relation] Board's factual conclusions for a different reason—Board members are presumed to have broad experience and expertise in labor-management relations. [Citation.] Further, it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute. Accordingly, it has been said that a Court of Appeals must abide by the Board's derivative inferences, if drawn from not discredited testimony, unless those inferences are 'irrational,' [citation] 'tenuous' or 'unwarranted.' " (*Id.* at p. 1079.)

We review questions of law, such as whether an error of law was made or the decision was procedurally sound, de novo. (*Gerawan Farming II*, *supra*, 23 Cal.App.5th at p. 1163.) "Board decisions that rest on 'erroneous legal foundations' will be set aside." (*Ibid.*)

As for statutory construction, generally the Board's interpretation of the Act is given deference because the Board is the administrative agency entrusted with enforcement of the statute; therefore, courts will follow the Board's interpretation unless it is clearly erroneous. (*Arnaudo Brothers*, *L.P. v. Agricultural Labor Relations Bd.* (2018) 22 Cal.App.5th 1213, 1226 (*Arnaudo Brothers*).) Nevertheless, it is the court's fundamental responsibility in construing a statute to ascertain the Legislature's intent so as to effectuate the law's purpose. Thus, the Board cannot alter or amend the Act, or enlarge or impair its scope. (*Ibid.*; *J.R. Norton Co. v. Agricultural Labor Relations Board* (1979) 26 Cal.3d 1, 29.)

As for our review of the Board's remedies, "because the Board has broad discretion to fashion remedies to effectuate the purposes of the ALRA, courts take a

---

[4] The ALRA directs that we rely on applicable precedents of the National Labor Relations Act. (§ 1148; *Highland Ranch v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855–856.)

cautious approach and will interfere only where the remedy is patently unreasonable under the statute [citation], or where the remedy seeks to achieve ends other than those which can fairly be said to effectuate the policies of the ALRA." (*Gerawan Farming II*, *supra*, 23 Cal.App.5th at pp. 1163–1164.)  The Board's discretion must be exercised reasonably, not punitively.  (*Id.* at p. 1164.)

## II.     MMC and the Duty to Bargain in Good Faith

We begin with Gerawan's challenge to the Board's ability to make an unfair labor practice finding.  Gerawan contends that because it was compelled into MMC, it may not be found liable for bad faith bargaining based on positions it took during the MMC process.  An evaluation of this claim requires us first to review the ALRA and MMC statute, and then discuss the interplay between the two as it applies here.

### A.     *The ALRA*

The Legislature enacted the ALRA in 1975 "to provide for collective-bargaining rights for agricultural employees" (§ 1140.2) by putting into place a system of laws generally patterned after the National Labor Relations Act (29 U.S.C. § 151; the NLRA).  (*J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at p. 8, see § 1148 [implementing the ALRA, the Board follows applicable NLRA precedents].)  "The ALRA established an elaborate framework governing the right of agricultural workers to organize themselves into unions to engage in collective bargaining with their employers." (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1129.)  The ALRA also created the Board and "granted it 'specific powers and responsibilities of administration, particularly in conducting and certifying elections and in investigating and preventing unfair labor practices.' " (*Gerawan Farming I*, at p. 1130.)  "[T]he ALRA identifies a number of unfair labor practices and other unlawful acts (§§ 1153, 1154, 1154.5, 1155.4, 1155.5), and empowers the Board to investigate, prevent, and remedy such practices (§ 1160)." (*Id.* at p. 1131.)

When a labor organization becomes the employees' bargaining representative as a result of an election, a duty to bargain is created, which requires the employer and labor representative to "bargain collectively in good faith" in order to reach an agreement "with respect to wages, hours, and other terms and conditions of employment," although "such obligation does not compel either party to agree to a proposal or require the making of a concession." (§ 1155.2, subd. (a).)[5] The duty to bargain "has no time limit"—the duty continues until the union is replaced or decertified through a subsequent election. (*Gerawan Farming I*, *supra*, 3 Cal.5th at pp 1153–1154.) It is an unfair labor practice for an employer "[t]o refuse to bargain collectively in good faith" with a certified labor organization. (§ 1153, subd. (e); see *Dal Porto*, *supra*, 163 Cal.App.3d at p. 548.)

### B.     The MMC Statute

In 2002, the Legislature determined "additional legislation was necessary to fulfill the goals of the ALRA because it had proven ineffective at facilitating the negotiation and completion of [CBAs]." (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1130.) The Legislature concluded a mediation procedure would " 'more fully attain the purposes of the [ALRA], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural labor force, and promote California's economic well-being by ensuring stability in its most vital industry.' " (*Id.* at pp. 1132–1133.)

"The Legislature therefore enacted the ALRA's 'mandatory mediation and conciliation' (MMC) provisions to 'ensure a more effective collective bargaining process

---

[5]     Section 1155.2, subdivision (a) provides: "For purposes of this part, to bargain collectively in good faith is the performance of the mutual obligation of the agricultural employer and the representative of the agricultural employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any questions arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession."

12.

between agricultural employers and agricultural employees.' " (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1130.) "The MMC statute sets forth a process, known as compulsory interest arbitration, 'in which the terms and conditions of employment are established by a final and binding decision of an arbitrator.' [Citation.] Unlike 'grievance arbitration,' which focuses on 'construing the terms of an existing agreement and applying them to a particular set of facts,' interest arbitration 'focuses on what the terms of a new agreement should be.' [Citation.] The MMC process results in 'quasi-legislative action' by which '[t]he terms of the "agreement" determined by the arbitrator [are] imposed upon [the employer] by force of law.' " (*Id.* at p. 1133.)

"Either an agricultural employer or a union representative may invoke the MMC process by filing with the Board 'a declaration that the parties have failed to reach a collective bargaining agreement and a request that the board issue an order directing the parties to mandatory mediation and conciliation of their issues.' (§ 1164, subd. (a).)" (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1133.) If the declaration satisfies the statutory requirements, "the board shall immediately issue an order directing the parties to [MMC] of their issues." (§ 1164, subd. (b); Cal. Code Regs., tit. 8, § 20402.[6])[7]

"Mediation" proceeds for 30 days; when that period expires, "if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been exhausted." (§ 1164, subd. (c).) The mediation period may be extended an additional 30 days "[u]pon mutual agreement of the parties." (§ 1164, subd. (c); Cal. Code Regs., § 20407, subd. (a).) The 30-day period commences "on the date of the first scheduled mediation session." (Cal. Code Regs., § 20407, subd. (a).)

---

[6]     Further references to regulations are to title 8 of the California Code of Regulations.

[7]     To invoke MMC, "[t]he parties must have never had a contract, they must have 'failed to reach agreement for at least one year' after the initial request to bargain, and the employer must have committed an unfair labor practice." (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1142, citing § 1164.11.)

"The Board's implementing regulations specify how the mediation is to be conducted." (*Gerawan Farming*, *Inc. v. Agricultural Labor Relations Bd.* (2019) 40 Cal.App.5th 241, 247 (*Gerawan Farming III*).) "[T]he parties are required to serve on each other, and on the mediator upon his or her selection, a document which identifies the disputed and undisputed issues, as well as the standards by which they propose to resolve the disputed issues, and provides agreed-upon contract language for the issues not in dispute. (Cal. Code Regs., § 20407, subd. (a)(1).)" (*Id.* at p. 248.) The parties may engage in discovery and "[t]he mediator may enforce discovery duties by drawing adverse inferences, or imposing terms, conditions, or sanctions upon a party." (*Ibid.*) The mediator presides at the mediation, ruling on the admission and exclusion of evidence, and retains "discretion to go off the record at any time to clarify or resolve issues informally," although off-the-record communications "shall not be the basis for any findings and conclusions in the mediator's report." (Cal. Code Regs., § 20407, subd. (a)(2).)

Within 21 days after the mediation period expires, the mediator files "a report with the board that resolves all of the issues between the parties and establishes the final terms of a [CBA], including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process. With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination. The mediator's determination shall be supported by the record." (§ 1164, subd. (d); Cal. Code Regs., § 20407, subd. (c).)

Either party may petition the Board for review of, or to set aside, the mediator's report on grounds set forth in section 1164.3, subdivisions (a) and (e). If a prima facie case for review is not shown or no petition is filed, the report becomes the Board's final order. (§ 1164.3, subd. (b).) If the Board finds grounds to grant review, it issues a decision on the petition and, if it finds a provision of the mediator's report to be unlawful, it requires the mediator to modify the CBA's terms, meet with the parties for further

14.

mediation, and submit a second report. (*Id.*, subd. (c).) As before, the parties may petition the Board for review of the second report. (*Id.*, subd. (d).) If no petition is filed or the petition fails to state a prima facie case of a violation of subdivision (a), the second report takes effect as the Board's order. (*Ibid*.) If the petition is subject to review under subdivision (a), the Board determines the issues and issues a final order. (*Ibid.*)

In *Gerawan Farming I*, our Supreme Court, in holding that an employer may not refuse to bargain with a union on the basis that it abandoned its representative status, rejected the contention that "the MMC process falls 'outside the ordinary bargaining context' " as "the text and structure of the statute indicate that the MMC process is a continuation of the ordinary bargaining process." (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1156.) The court noted that "[i]n many cases, the parties may reach a voluntary agreement on all or most of the disputed terms before the mediator writes a final report or before the ALRB issues its final order." (*Ibid*.) The court explained that MMC "is not wholly distinct from 'normal' bargaining because it imposes contract terms on the parties" since "[t]he *availability* of interest arbitration, as an ultimate recourse, is itself a bargaining tool that the Legislature believed would facilitate resolution of disputes and consummation of first agreements." (*Id.* at p. 1157.) The court further explained that while the state of the law before the enactment of the MMC statute imposed on employers a continuing duty to bargain, but did not compel them to agree to a proposal or require them to make a concession, "[w]hen the Legislature later enacted the MMC statute, it expanded the 'duty to bargain' to include the MMC process." (*Gerawan Farming I*, at p. 1157.)

### C.    *MMC and Unfair Labor Practice Liability*

Here, the parties held nine negotiation sessions from January 17 to March 28, 2013. The Union asked the Board to order MMC on March 29, which it did on April 16. The mediator was appointed in May and the parties met with him in off-the-record sessions on June 6 and 11. At some point, the mediator asked the parties to negotiate

15.

outside his presence while the MMC process was ongoing. The parties met four times outside the mediator's presence—on June 3 and July 1, 24, and 29—to see if they could reach a voluntary agreement on disputed terms. Thereafter, on-the-record MMC sessions were held on August 8 and 19, and the mediator issued his report on September 28.

In his decision, the ALJ noted the complaint charged Gerawan with engaging in "overall bad faith surface bargaining during the 2013 voluntary negotiations," with the term "voluntary" referring to negotiations "that occurred outside those mandated by the MMC process." The ALJ further noted that with the exception of "a few overlapping exhibits, little, if any, evidence was adduced concerning the bargaining that occurred under the auspices of the mediator." In addressing this charge, the ALJ concluded the parties' progress toward an agreement could be measured best by comparing their positions reflected in their initial January proposals against their arguments prepared in late July and early August for submission to the mediator, as well as a late August matrix that set forth their positions.

In its exceptions to the ALJ's decision, Gerawan contended that because MMC "supplants mutual, good faith bargaining," good faith bargaining is not required once the parties are ordered into MMC. In addressing this contention, the Board stated it previously found, and the California Supreme Court confirmed in *Gerawan Farming I*, that MMC is not a substitute for bargaining but rather an extension of the bargaining process. The Board rejected Gerawan's suggestion the statutory good faith bargaining obligation does not apply where referral to MMC is possible or after MMC is requested: "The possibility a party may request referral to MMC, or the fact that a party has done so, does not privilege the other party to disregard its bargaining obligation or to otherwise engage in a campaign of bad faith tactics to frustrate bargaining and the prospect of reaching agreement."

The Board also rejected Gerawan's argument that the ALJ erred in relying on evidence from the MMC proceedings to support his bad faith finding. Since Gerawan

16.

failed to identify any testimony or exhibits it claimed the ALJ improperly relied on, the Board found Gerawan failed to satisfy the requirement of California Code of Regulations section 20282, subdivision (a)(1)[8] to cite to the record. In addition, the Board noted the ALJ recognized the ULP allegations pertained to voluntary negotiations, which were "those negotiations that took place outside of the context of MMC and without the presence of a mediator," and little evidence was adduced concerning bargaining that occurred under the mediator. The Board further noted the parties' joint stipulation of facts and exhibits established the admissibility of the contract proposals the ALJ referenced.

While it is not entirely accurate that the parties' negotiating sessions took place outside the context of MMC, as it was the mediator who asked the parties to continue negotiating, the sessions were held outside the mediator's presence to see if the parties could voluntarily reach agreement on disputed terms.[9] The question is whether Gerawan had a duty to bargain in good faith during these sessions such that unfair labor practice liability may be imposed if Gerawan refused to bargain in good faith.

As we have stated, once a union is certified, it remains the employees' exclusive collective-bargaining representative until it is decertified or a rival union is certified, and the employer has a duty to bargain with that union until either of those events occur.

---

[8] California Code of Regulations section 20282, subdivision (a)(1), provides: "The exceptions shall state the ground for each exception, identify by page number that part of the administrative law judge's decision to which exception is taken, and cite to those portions of the record which support the exception."

[9] Gerawan claims California Code of Regulations section 20407, subdivision (a)(1) also required it to meet with the Union outside the mediator's presence. That regulation provides that within seven days of receipt of the Board's order directing the parties to MMC, the parties are required to serve on each other, and the mediator upon his or her selection, a document which identifies the disputed and undisputed issues, and provides agreed upon contract language for the issues not in dispute. (Cal. Code Regs., § 20407, subd. (a)(1).) While the regulation requires the parties to exchange documents that set forth their positions and agreed upon contract language for undisputed issues, it does not require them to negotiate further.

(*Nish Noroian Farms* (1982) 8 ALRB No. 25, p. 14.) Thus, as Gerawan recognizes, its "bargaining obligations continued until the date the UFW was decertified" on November 5, 2013.[10] Those obligations included a duty to bargain in good faith. (§§ 1153, subd. (e), 1155.2; *Kaplan's Fruit & Produce Co., Inc.* (1977) 3 ALRB No. 28, pp. 2–3, 7.) "When the Legislature enacted the MMC statute, it expanded the scope of the 'duty to bargain' to include the MMC process." (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1157.)[11]

Thus, the good faith bargaining duty extends, at a minimum, to negotiation sessions held outside the mediator's presence during the MMC process. Gerawan asserts the MMC statute replaced consensual bargaining with a one-time exception to the ALRA's prohibition on compelled concessions and forced agreements. We disagree.

As stated above, "[t]he ALRA established an elaborate framework governing" agricultural workers' right to organize into unions and collectively bargain with their employers. (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1129.) That "elaborate framework" includes granting the Board the power to investigate and prevent unfair labor

---

[10] We asked the parties to address in supplemental briefing the effect, if any, of the Union's decertification on the issues or arguments raised in this proceeding. The parties agree the decertification rendered the contract imposed pursuant to the MMC process null and void, but does not render the unfair labor practice charges in this proceeding null and void because the charges relate to bargaining conduct between January and August 2013, before the November 2013 decertification election. Gerawan, however, asserts the decertification, and our decision in *Gerawan II*, *supra*, 23 Cal.App.5th 1129, have some bearing on the outcome of this proceeding. We will discuss Gerawan's supplemental arguments where appropriate.

[11] We acknowledge that in making this statement, the court was not deciding whether a party compelled into MMC remains subject to a good faith duty to bargain. Nevertheless, as we have recognized, MMC proceedings formalize the usual give and take of contractual negotiations with a mediator, throughout that process the parties remain free to resolve the disputed issues, and "on-the-record MMC proceedings are part and parcel of the negotiating process." (*Gerawan Farming III*, *supra*, 40 Cal.App.5th at pp. 270–271.) Since negotiation does not end when MMC is invoked, an employer has a continuing duty to bargain during MMC.

18.

practices. (*Id.* at p. 1130.) The Legislature added the MMC statute to this "elaborate framework" for one purpose—to facilitate the negotiation and completion of CBAs, as the Act had proven ineffective at facilitating the negotiation and completion of CBAs. (*Id.* at p. 1130.) Throughout the MMC process, "the parties are free to resolve the disputed issues." (*Gerawan Farming III*, *supra*, 40 Cal.App.5th at p. 271.) It is only if the parties fail to reach voluntary agreement on those terms that a contract will be imposed on them by force of law. Thus, "the MMC process is a continuation of the ordinary bargaining process," not a replacement for consensual bargaining. (*Gerawan Farming I*, at p. 1156.)

Gerawan contends that because the MMC statute does not incorporate or reference the statutory duty to bargain, the Legislature did not intend to extend the duty to bargain to MMC. According to Gerawan, it is "implausible" to suggest the Board may impose liability for bad faith bargaining within MMC when the Legislature made clear its view that existing bargaining obligations and the Board's ability to enforce good faith bargaining had failed to achieve contracts. (See *Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1141 ["the Legislature reasonably could have concluded that a mediation process followed by binding arbitration in the event of a bargaining impasse would 'correct' the ALRA's failure and facilitate the adoption of first contracts"].)

That the Legislature enacted the MMC process because the Board had been unable to enforce good faith bargaining, however, does not mean the Legislature intended to eliminate the Board's enforcement authority with respect to the parties' negotiations outside the mediator's presence. Although the MMC statute does not address the statutory duty to bargain, the MMC statute is part of the ALRA, which makes the refusal to bargain in good faith an unfair labor practice and empowers the Board to prevent such

19.

conduct. (§§ 1153, 1155.2, subd. (a), 1160.)[12] Contrary to Gerawan's assertion, there is no conflict between the MMC statute or its implementing regulations[13] and the statutory duty to bargain that requires us to construe MMC as not including a good faith bargaining duty with respect to the parties' negotiations outside the mediator's presence. (See *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 420 [citing the axiom of statutory construction that a particular or specific provision takes precedence over a conflicting general provision]; Code Civ. Proc., § 1859].)

Gerawan questions how the statutory definition of good faith bargaining in section 1155.2, subdivision (a), which expressly does not compel a party to agree to a proposal, can possibly apply in MMC, which imposes an agreement by force of law. But in MMC, when negotiating outside the mediator's presence, the parties are not compelled to agree to a proposal or required to make a concession. Rather, if the parties cannot reach agreement, they present their positions on disputed terms to the mediator with supporting evidence. If done in good faith, the parties have satisfied their good faith bargaining duty. Contrary to Gerawan's assertion, imposing unfair practice liability does not punish an employer for exercising a choice between making concessions to avoid the mediator from imposing a term or standing on its objections to the union's proposed terms. Whatever choice the employer makes, unfair practice liability may not be imposed if the employer's position is taken in good faith.

Gerawan asserts the MMC statute does not grant the Board jurisdiction to adjudicate the parties' bad faith conduct during MMC. But it did not need to do so, as the

---

**12** Section 1160 provides: "The board is empowered, as provided in this chapter, to prevent any person from engaging in any unfair labor practice, as set forth in Chapter 4 (commencing with Section 1153) of this part."

**13** Gerawan contends imposing a good faith bargaining duty rewrites the MMC regulations because the regulations are silent about imposing such a duty. The regulations, however, simply set out the procedure for conducting MMC proceedings and for the Board's review of the mediator's report. They do not address bargaining conduct within MMC or in negotiating sessions held outside the mediator's presence.

Board has jurisdiction to adjudicate unfair labor practice charges under another section of the ALRA, namely, section 1160, which empowers the Board "to prevent any person from engaging in any unfair labor practice" as set forth in the ALRA. For this reason, Gerawan's claim that the Board lacks implied statutory authority to police bargaining within MMC fails, as it has been granted express authority to do so.[14]

Adjudicating an unfair labor practice charge arising from the parties' negotiations outside the mediator's presence does not undermine the finality of the Board's order enforcing the mediator's report, as Gerawan suggests. This is because, unlike the case Gerawan cites, *Rios v. Allstate Ins. Co.* (1977) 68 Cal.App.3d 811, 818, in which the plaintiff who sued his insurer for bad faith based on the insurer's conduct during an arbitration proceeding had the ability to challenge that conduct by moving to vacate the arbitration award, the Board did not have the ability to challenge Gerawan's purported bad faith bargaining in the MMC proceedings, as those proceedings concerned only setting the terms of a CBA.

Gerawan asserts the UFW's election to pursue MMC rather than avail itself of remedies for bad faith bargaining outside MMC raises due process concerns, since allowing the UFW to pursue both MMC and unfair labor practice remedies would result in double recovery for the same alleged harm. We disagree. This is not a situation where there is a possibility for multiple damage awards for the same conduct, as in *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 423, or where Gerawan would be required to pay a single debt more than once, as in *Western Union Telegraph Co. v.*

---

[14] In making this argument, Gerawan relies on the interpretative principle that where " ' "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." ' " (*INS v. Cardoza-Fonseca* (1987) 480 U.S. 421, 432.) This principle does not apply here, however, as the present issue is not the interpretation of particular language within the Act, but rather whether the Board's authority granted it in section 1160 extends to bargaining conduct during the course of MMC proceedings.

21.

*Pennsylvania* (1961) 368 U.S. 71, 77. MMC is not a process by which one party recovers damages from the other; rather, MMC is "intended to be factfinding proceedings that create a record from which the mediator determines those terms the parties are unable to resolve by the end of the MMC process." (*Gerawan Farming III*, *supra*, 40 Cal.App.5th at pp. 270–271.) Although the end result of MMC is a contract which is imposed on the employer by force of law (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1133), it does not punish an employer for conduct during negotiating sessions held outside the mediator's presence. Instead, that is addressed through the Board's authority under section 1160 to prevent employers from engaging in unfair labor practices.

Gerawan next contends the ALJ and Board improperly relied on exhibits that reflected proposals the parties exchanged during MMC and were submitted to the mediator. Gerawan argues off-the-record communications are inadmissible under the mediation privilege of Evidence Code section 1119, while on-the-record proceedings are subject to the litigation privilege of Civil Code section 47.

With respect to the mediation privilege, Gerawan asserts the regulations expressly state off-the-record communications are inadmissible. California Code of Regulations section 20407, subdivision (a)(2), states that the mediator presides at the mediation, all evidence upon which the mediator relies in writing his or her report must be preserved in an official record, and the mediator "retain[s] the discretion to go off the record at any time to clarify or resolve issues informally." The regulation further provides: "All communications taking place off the record shall be subject to the limitations on admissibility and disclosure provided by Evidence Code section 1119, subdivisions (a) and (c), and shall not be the basis for any findings and conclusions in the mediator's report." (Cal. Code Regs., § 20407, subd. (a)(2).)[15] The proposals the ALJ and Board

---

[15] Evidence Code section 1119, which states the fundamental rule regarding confidentiality of mediation communications, provides: "(a) No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible or subject to discovery, and

relied on, however, were prepared for the mediator in conducting the on-the-record sessions, not for the off-the-record discussions.[16] As such, they were not subject to the mediation privilege.

As for Gerawan's contention the litigation privilege of Civil Code section 47, subdivision (b) bars admission of the proposals, the privilege immunizes participants from tort liability arising from communications made during judicial proceedings. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 214.)  While Gerawan asserts on-the-record MMC proceedings are equivalent to a court proceeding, it does not explain how unfair labor practice proceedings are equivalent to tort proceedings or why the privilege should apply here.  Moreover, the privilege does not bar the evidentiary use of Gerawan's proposals.  (*Shade Foods*, *Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 914–915 [" 'when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the

---

disclosure of the evidence shall not be compelled, in any arbitration, [or] administrative adjudication, … in which, pursuant to law, testimony can be compelled to be given.  [¶] … [¶]  (c) All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."  The regulation excludes Evidence Code section 1119, subdivision (b), which provides:  "No writing … that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given."

[16]     The ALJ compared the parties' January proposals to (1) the Union's July 26, 2013 "Proposal with [S]upporting Arguments" (Joint Exhibit 57); (2) Gerawan's August 2, 2013 "Current Proposals of the Parties[,] Company's Supporting Arguments" (Joint Exhibit 59); and (3) the August 30, 2013 "Updated Matrix (Gerawan Farming and UFW-Stipulated)."  The MMC regulations require the parties to "provide the mediator with a detailed rationale for each of its contract proposals on issues that are in dispute" and "provide on the record supporting evidence to justify those proposals."  (Cal. Code Regs., § 20407, subd. (a)(1).)

23.

individual acted with the requisite intent' "; therefore, statements made during a judicial proceeding may be used to prove the existence of bad faith in an action against an insurer].) Since the ALJ and Board used Gerawan's proposals to determine Gerawan's intent to reach an agreement to establish whether it engaged in bad faith bargaining, the litigation privilege does not apply.

Finally, Gerawan claims the Board's adjudication of unfair labor practice charges based on conduct within MMC violated the United States Constitution in two ways: (1) the retroactive imposition of bargaining liability violates the First Amendment; and (2) imposing liability for conduct within a quasi-legislative process violates due process.

Gerawan asserts the Board's post hoc review of the bargaining process violated the First Amendment's prohibition against "inquisitorial investigations of protected expressive activity." Gerawan claims the Board forced it to choose between "refraining from core political speech" or "engaging in that speech and risking costly Board proceedings, monetary penalties and enforcement orders." In support, Gerawan cites cases addressing: (1) a federal court's ability to enjoin Congress's issuance of a subpoena directed to a bank claiming a First Amendment privilege for the records sought on the ground they were equivalent to confidential membership lists (*Eastland v. United State Servicemen's Fund* (1975) 421 U.S. 491); (2) the conflict between individual rights of free speech and association and the government's interest in conducting legislative investigations (*Gibson v. Florida Legislative Investigation Committee* (1963) 372 U.S. 539, 543); (3) whether liquor license holders have a First Amendment right to protest the granting or transfer of a similar license for the sole purpose of preventing or limiting competition (*Matossian v. Fahmie* (1980) 101 Cal.App.3d 128, 132); and (4) whether an attorney fees award for frivolous conduct based on the prosecution of a colorable claim for an improper purpose violates the First Amendment's petition clause (*Gordon v. Marrone* (N.Y. 1992) 590 N.Y.S.2d 649, 650-651). None of these situations are at issue here. While Gerawan claims it is being punished for exercising its First Amendment

right to speak during the MMC proceedings, Gerawan's conduct during MMC proceedings before the mediator was not at issue here.

With respect to Gerawan's due process claim, Gerawan does not cite any authority to support its argument that a due process violation exists because the Board both reviewed Gerawan's objections to the mediator's initial report (with the second report becoming the Board's final order after no party objected) and adjudicated whether Gerawan engaged in good faith bargaining. The sole case Gerawan cites, *BE&K Constr. Co. v. NLRB* (2002) 536 U.S. 516 (*BE&K Constr.*), addressed the issue of whether the National Labor Relations Board (NLRB) may impose unfair labor practice liability for an employer's retaliatory lawsuit that was unsuccessful but not objectively baseless. (*Id.* at p. 526.) While the court recognized the question raised concerns regarding the First Amendment right to petition, ultimately it did not decide that issue. (*BE&K Constr.*, at pp. 529–533, 535–536.) Instead, the court held the NLRB incorrectly interpreted the National Labor Relations Act to allow for punishment of unsuccessful suits as "retaliatory" even though they may have been reasonably based. (*BE&K Constr.*, at pp. 536–537.) As the court did not even decide the constitutional issue, the case has no bearing here.

In sum, there is no conflict between the MMC statute and ALRA with respect to imposing unfair practice liability for acts arising from the parties' negotiation sessions held outside the mediator's presence.

## III.     Unfair Labor Practice Findings

Gerawan challenges both unfair labor practice findings—that it engaged in bad faith surface bargaining and insisted on the exclusion of workers employed by farm labor contractors. Gerawan contends the Board's findings are erroneous, arbitrary and not supported by the record considered as a whole.

### A. *Hearing Evidence*

The Union presented its first proposal at the first negotiation session on January 17, 2013, which contained 28 articles, but did not include an economic proposal. The Union finally submitted an economic proposal in July 2013. According to Union negotiator Elenes, the Union did not present an economic proposal earlier because it was waiting for Gerawan to provide information the Union had been requesting for some time. Elenes recalled the Union was missing information on health care, which he thought was something like participation rates or how many people were actually in the plans, as well as some other items he could not remember. The Union received the information sometime in July, when it was able to finalize the economic proposal. The Union had requested information such as Gerawan's vacation policy, bonuses and holidays; some information was provided in December 2012 and June 2013, but not all of it, and the Union did not receive the additional information until sometime in July 2013.

According to Gerawan's negotiator Barsamian, Gerawan produced the information the Union requested in its October 2012 letters over the following two months and everything was produced by the end of 2012. After the MMC process began, the Union subpoenaed documents and information from Gerawan, some of which it produced at the June 11, 2013 mediation session. Gerawan provided other information in a June 22, 2013 email. Barsamian testified that Gerawan provided some of the subpoenaed information to the Union in the MMC process. Gerawan rejected the Union's economic proposal.

Gerawan presented its opening proposal on January 18, 2013. It contained 17 articles and called for a one-year agreement with an automatic renewal clause. Gerawan refused to alter its position on the agreement's term. Near the end of negotiations, Gerawan justified its position based on its firm belief "that given the situation giving rise to this mediation, a one-year agreement is the most logical beginning for any relationship between these parties." The remaining articles addressed only non-

economic matters. Elenes, recalling his initial reaction to Gerawan's proposals, said he was "taken aback," as he "had never seen a proposal like this."

The cover page of Gerawan's proposal contained a statement that it was being "made without, in any way, wa[i]ving any argument or position that Gerawan has taken or may take regarding whether the UFW is entitled to represent the agricultural employees of Gerawan due to the UFW's abandonment of its representation of the agricultural employees and failure to meet its obligations to bargain in good faith with Gerawan." Barsamian explained the statement was made "just to protect their rights."

We review the evidence as to each proposal at issue below.

### 1. Union Recognition

The Union's first article, entitled "Recognition," contained what Elenes called "very standard language," which stated that Gerawan recognized the Union as the exclusive representative of its agricultural employees and described the unit. In addition, the Union sought Gerawan's commitment, among other things, that it would not make individual agreements with unit employees and would encourage employees to "give u[t]most consideration to supporting and participating in collective bargaining and contract administration functions."

Gerawan's initial proposal named the parties to the agreement and contained a unit description, but did not contain a direct statement that it recognized the Union as the agricultural employees' exclusive representative. None of Gerawan's subsequent proposals contained language recognizing the Union as the exclusive bargaining representative. Gerawan eventually agreed to include language barring individual agreements, although it sought to carve out an exception for "cultural employees who have traditionally had their wages set based on past practice of individual evaluation of their performance, skills and experience." The parties tentatively agreed on two aspects of the first article, namely, parties' names and a prohibition against assignability.

## 2. Agency Shop/Checkoff

The Union's initial proposal entitled "Union Security," would establish an agency shop, which would require unit employees to either become members of the Union or pay an agency fee to the Union. Gerawan would be required to terminate or suspend employees who did not meet the membership/agency fee obligation on written notice from the Union. The proposal described the terms for establishing and operating a dues checkoff system, whereby Gerawan would deduct the employees' dues or agency fees from their paychecks and submit the amount collected to the Union to fund the Union's activities.

Gerawan's comparable proposal, entitled "Right to Work," provided for an open shop: "Neither membership in good standing in the Union, nor the payment of Union dues to non-member fees shall be a condition of employment with the Company." Neither party moved from their positions throughout the negotiations.

Gerawan's counsel stated in his opening statement that Gerawan "had very good reasons" for "proposing an open shop, what we call right to work." He explained that "after two decades of not being here, it literally should be up to the employees to decide whether they wished to pay money for the jobs they already had."

When Elenes saw the "Right to Work" heading during negotiations, he told Barsamian California is not a right to work state and he did not know "where you're coming from on this." Barsamian responded to the effect that Gerawan "believed in freedom of choice, employee free choice," meaning "the employees had the right to decide whether they want to pay dues or not pay dues, be a member of the UFW or not." According to Elenes, Gerawan was "adamant on that." Elenes said Gerawan did not want to be involved with deducting Union dues and fees, and the Union would need to deal with it. According to Elenes, this issue was a repeated point of contention throughout the negotiations.

28.

Barsamian testified throughout the negotiations, Gerawan "wanted an open shop and not having it as a condition of employment." This was due in part to the cost relating to deducting dues and fees, but "a large part of it was the company's deeply-held belief that an employee should have a free choice and not have their jobs depend on whether or not they joined a union." Barsamian, an experienced negotiator, did not know of any open shop UFW contract in California. Barsamian did not calculate the cost of deducting dues and fees, although the parties discussed deductions. When Elenes talked about how difficult it would be for the Union to collect dues, Barsamian brought up the fact that at another grower, "union reps used to have to go up and down the hillside" to collect union dues, as an example of a company that did not collect union dues.

Gerawan justified its position in its August 2013 argument in support of its right to work proposal by explaining that its employees "were (and still are) already being paid the highest wages in the industry before the Union made any effort to represent them, and thus the questionable concept of 'fair share' or 'free rider' simply does not apply here. The employees should not be forced to pay to keep their jobs, nor is there any justification to try to put those costs on the Company in the form of higher rates to cover the dues/fees…. The employees deserve to become acquainted with the Union and be provided with some semblance of service in the form of representation before being asked to pay money to it." Gerawan further stated that requiring it to "do the Union's bidding by furnishing dues check-off authorization forms" did not "foster any labor peace given the situation," and it was "just as logical, if not preferable, to have the Union not collect any dues or fees for the one-year period given its failure to fairly represent the employees for so long."

Elenes provided the following rationale for the Union's security proposal: "Well, obviously … we have an obligation to represent all employees …. And again, all our contracts have some type of union security language that indicates that the employees are either going to pay agency fees or going to pay dues, membership dues. And obviously

we need that to be able to collect dues, be able to collect agency fees so that we can fund the work that we're going to have to do to administer the contract and continue improving the conditions of other farm workers."

### 3. Seniority

The Union proposed to establish a seniority system that would apply as a factor in layoffs, recalls, promotions, transfers, and overtime. Seniority was defined as "the length of continuous service of an employee beginning with their date of hire," and the proposal identified when an employee began to acquire seniority, provided a means for breaking seniority ties, and identified the recordkeeping and information sharing required to administer the seniority system.

Gerawan's initial proposal did not contain a reference to seniority. Instead, it provided, with respect to hiring, work assignments and layoffs, that the Union recognized "the Company and the employees have worked together under a policy whereby the Company has the sole and exclusive authority to decide which employees shall be hired or laid off." It also provided that Gerawan would have "sole and exclusive authority" to decide work assignments, transfers and promotions.

Elenes argued to Gerawan that a seniority system was needed because employees were complaining that they were either not being recalled or not being recalled in order, which was a huge issue of contention for the employees. To try to reach agreement, the Union proposed changing "seniority" to "length of service," as Gerawan did not like the word "seniority" and Barsamian started using the "length of service" term. The parties, however, started arguing about the definition of "length of service," as the Union wanted length of service to be used in recalling or laying off employees, while Gerawan wanted to retain the right to recall and lay off employees based on the company's judgment.

Barsamian testified that because the Union had not dealt with Gerawan for a long time and negotiations were taking place when employees were not working, "quite a bit of discussion" involved trying to explain to Elenes how things worked at the company.

30.

Barsamian explained the Union's seniority proposal was "a rather strict seniority type of provision" that would have prevented movement between crews for purposes other than seniority, which would interfere with Gerawan's practice of allowing employees to move from crew to crew due to things such as carpooling or family relationships.

While the Union changed the term "seniority" to "length of service" in its later proposals, the rest of the provision remained the same. Gerawan continued to reject any limitation on its exclusive control over layoffs, recalls, work assignments, promotions and transfers, including any application of seniority as a controlling factor in any employment decision, regardless of what it is called. Gerawan's later proposal set forth its current method of considering an employee's length of service, which was to include all of the employee's past service, regardless of whether it was continuous, although it included length of service as one factor to be considered when recalling or laying off employees, or filling job vacancies.

### 4. Grievance-Arbitration

The Union proposed a grievance and arbitration procedure as the "exclusive means" for resolving all disputes concerning the interpretation or application of the agreement. The procedure involved a three-step process preceding arbitration to allow for a negotiated resolution, but if that failed, an arbitration would be conducted using arbitrators from the American Arbitration Association.

Gerawan's initial proposal for resolving employee concerns provided: "The Union recognizes that the Company and the employees have resolved employee concerns through the Company's internal procedures and agrees that any grievances employees may have are best handled as per past practice. In the event an issue remains unresolved, the Company and the Union may confer on what approach or venue might be utilized to resolve the issue. A designated Union representative may be present during a meeting between an employee and a Company representative when requested by the employer, as provided by law."

31.

By the end of August 2013, the parties had made considerable progress toward establishing a standard grievance-arbitration system. The August matrix reflected tentative agreements on eight separate provisions of the procedure and other areas of near agreement. For example, the parties had a tentative agreement on the use of arbitration if efforts through the initial three steps failed to produce a resolution. The only issues that remained for resolution were whether a union steward would be compensated for time involved in processing grievances and which arbitration service would be used.

### 5. No Strike-No Lockout

The Union proposed to "agree that there will be no strikes, boycotts or slowdowns by the Union against the Company during the life of this Agreement." The proposal would prohibit the use of unit employees as strike breakers and required Gerawan to agree there would be no lockouts during the agreement's term. According to Elenes, this was a very standard language in most UFW contracts.

Gerawan proposed that "[t]he Company, Union and the employees shall be free to take whatever lawful economic action they deem necessary during the term of this Agreement." According to Barsamian, Gerawan had a long history of allowing employees to engage in work stoppages and it did not want to restrict that right.

The parties remained committed to their original positions throughout their negotiations.

### 6. Just Cause

The Union proposed limiting Gerawan's right to discipline and discharge employees based on "just cause" standard, while Gerawan wanted to retain its at-will employment policy. Barsamian testified that throughout the seven months of negotiations, the parties discussed how the disciplining and discharge of employees should be done and Gerawan never rejected just cause. Instead, Gerawan "kept asking for a definition of just cause" to include in the contract. Barsamian explained Gerawan had a problem using the term—just cause was a new concept to Gerawan because it was

32.

an at-will company, so it "wanted a definition of what just cause meant." Barsamian admitted "just cause" was not a new term to him, but he had "struggled with it for decades in arbitrations, in administrative proceedings, employment litigation in court. It's one of those terms that comes up and everybody thinks they know what it is and everything else—it's like three blind men describing an elephant." The Union made no attempt to satisfy Gerawan's demand for a precise definition of just cause.

### 7. Management Rights

The Union's initial proposal included a management rights provision which provided: "The Company will retain all its rights of management except as expressly and explicitly modified by this Agreement."

Gerawan's initial proposal addressing "Management Rights," provided, in part: "All of the rights, powers, prerogatives, and authorities that the Company has historically exercised are retained except those specifically abridged or modified by this Agreement; including, but not limited to: the right to hire, promote, discharge or discipline, and to maintain discipline and efficiency of employees. The Company maintains the specific right to review the performance and production capabilities of each employee as part of its disciplinary procedure." The proposal further provided that Gerawan would have the exclusive responsibility to determine the products grown, harvested or sold, and the schedule and manner of production, and it retained the right to make all business operation decisions. It was also Gerawan's responsibility to "direct and supervise all employees, to assign and transfer and layoff employees," and determine when overtime would be worked.

By the end of August, the Union had slightly altered its proposal on this subject to provide that the parties agreed it was Gerawan's duty and right "to manage and direct its operations and employees"; therefore, Gerawan reserved "all rights, powers, and authority in connection therewith, except as specifically limited by" the agreement's express provisions. Gerawan, however, did not alter its proposal at all.

33.

### 8. Farm Labor Contractors

The Union proposal regarding farm labor contractors reflected the objectives of limiting the use of farm labor contractors and when it was necessary to utilize them, protecting direct hires and FLC workers. The proposal required Gerawan to use its direct hire employees for all bargaining unit work and prohibited the use of FLC workers "if doing so would cause the layoff or loss of hours worked by direct hire employees." In addition, FLC workers would be part of the bargaining unit and farm labor contractors hired to perform work covered by the agreement would "be required to provide equal wages, terms and conditions of employment" to FLC workers as those required under the agreement. Finally, Gerawan would be required to terminate its contractual relationship with any farm labor contractor "documented to be in repeated violation of any federal or state law or regulation concerning employee terms and conditions of employment, employee health, or employee safety," with "documented to be in violation" defined as "reasonable evidence" presented to company management of repeated violations of state or federal laws or regulations.

Gerawan's initial proposal on farm labor contractors excluded FLC workers from the contract: "The Union agrees and understands that the Company retains the use of services provided by farm labor contractors. The Union agrees that no provision of this Agreement shall apply to farm labor contractors or to the employees provided by farm labor contractors."

Elenes recalled telling Gerawan the proposal to exclude FLC workers from the agreement was illegal; Gerawan responded they were not Gerawan's employees. Elenes conceded the Union had previously agreed to exclude FLC workers from other contracts, but he explained there was no enforcement of that issue in the past and the Union had been fixing that issue when renegotiating those contracts. According to Elenes, the Union was always pushing to treat FLC workers the same as direct hires, but it was a constant battle.

Barsamian denied that Elenes told him Gerawan's proposal was illegal.[17] Barsamian testified he explained to Elenes that Gerawan proposed excluding FLC workers from the contract because they were not used regularly. To address this, the Union proposed amending its proposal to read: "The Company will make best efforts to utilize its own direct hire employees for all bargaining unit work but in no case will FLC employees be utilized, if doing so, would cause the layoff or loss of hours worked by direct hire employees." Gerawan rejected the modification at that time. Barsamian testified it was his position that everything under the contract, other than the economics, would apply to FLC workers.

In its June 3, 2013 proposal, Gerawan eliminated the sentence of its initial proposal that stated the agreement did not apply to farm labor contractors. Gerawan added sections providing that farm labor contractors would set their employees' "wage rates paid and benefits provided," and utilize discipline and discharge procedures, in compliance with federal and state law, and any union grievances arising from employment of FLC workers would be served on the farm labor contractor and Gerawan's human resources office. In addition, Gerawan proposed to "continue its past practice of making its best efforts to form and employ its direct-hire crews before utilizing farm labor contractor crews," but that was not a guarantee that all direct-hire crews would be employed before, or laid off after, all FLC workers.

By July 21, 2013, the Union had dropped its proposal requiring Gerawan to terminate farm labor contractors who repeatedly violated labor laws. In arguments to the mediator, Gerawan asserted there was nothing illegal about its proposal, pointing to other

---

**17** Even if Elenes did not raise the legality of Gerawan's proposal during negotiations, the Union's position the proposal "would illegally exclude" FLC workers "from contract coverage regarding wages, benefits, discharge and discipline" was made clear in its July 26, 2013 arguments to the mediator. Barsamian testified he heard the assertion of illegality from another Union person during the formal MMC proceedings.

UFW contracts that either wholly or partially excluded FLC workers, and its proposal rationally distinguished between direct-hire and FLC workers.

### 9. Union Obligations

Gerawan proposed to include an article entitled "Union Obligations," which had three sections. The first was a wide-ranging "hold harmless and indemnification" provision by which the Union agreed "to indemnify and hold the Company harmless from any and all claims, losses, damages, costs or expenses whatsoever including reasonable attorneys' fees that it may incur directly or indirectly as a result of the Company performing under this Agreement, or due to the acts or omissions, breach of any provisions of this Agreement or violation of any federal, state, local statute, regulation or ordinance by the Union or its officers, director, employees, agent or volunteers under its control. The Union agrees to protect, defend, indemnify and hold the Company and its employees free and harmless from and against any and all losses, claims, liens, demands and causes of action of every kind and character including the amount of judgment, penalties, interests, court costs and legal fees incurred by the Company in defense of the same, arising in favor of any party including governmental agencies."

The second section required the Union to purchase and maintain insurance from a provider approved by Gerawan in an amount that would protect it from claims which may arise from the performance of its duties under the agreement, the Union's presence on Gerawan's property, and any actions or activities that concerned or affected Gerawan. The Union would be required to obtain the following insurance: (1) to cover workers compensation and disability claims, as well as claims under similar employee benefit acts, in amounts required by law; (2) $50 million in comprehensive general liability coverage; (3) $100 million in directors' and officers' errors and omissions coverage; and (4) $100 million to cover the Union's indemnification requirements in the first section. !

The last section required the Union to cooperate with workers compensation fraud investigations initiated by Gerawan or its insurers, and to waive any claims of unlawful surveillance as a part of this commitment.

The Union had no comparable proposal. According to Barsamian, this proposal was included because Gerawan's general counsel made it clear they had always required this kind of provision for any vendors, companies or associates that came onto the property, as Gerawan was very concerned about liability and being a target of liability lawsuits. Gerawan wanted the same provision to apply to the Union because the Union would have personnel on the property.

In its August 30, 2013 proposal, Gerawan lowered the insurance coverage limits to $1 million, except the general liability insurance coverage would be $1 million per person or $2 million per incident. In its argument regarding this proposal, Gerawan explained it took "into account the government-imposed nature of any agreement resulting from this mediation, which was invoked upon the application made by the Union." Gerawan was concerned about being held responsible for the Union's conduct given that after a 20-year absence, the Union had "attack[ed] the Company without having attempted to gain any experience about its operations or the employees within the bargaining unit." Gerawan cited examples of employees complaining about Union organizers visiting them at their homes and engaging in threatening and intimidating conduct. In addition, Gerawan was concerned the Union was in a "distressing economic situation" that would affect its ability to address any liability that may be imposed on the Union. Gerawan asserted it had a right to be informed as to proper workers' compensation coverage, since Union representatives would be coming onto Gerawan's property.

The Union's notes of the March 21, 2013 bargaining session reflect that Elenes told Barsamian the indemnification/insurance proposal was "junk."

## B.     The ALJ's Findings

The ALJ found Gerawan engaged in surface bargaining based on the totality of the circumstances.  First, the ALJ found that "[c]ritical delays marked the bargaining process that followed the UFW's reemergence in October 2012."  The ALJ noted there was a three-week delay in answering the Union's request to bargain and when Gerawan finally replied, it did not mention the requested information and lectured about the Union's potential to invoke the MMC process.  The ALJ found that while Gerawan provided some of the Union's requested information in December 2012, it "delayed furnishing critical economic information" until late June or early July 2013, thereby preventing the Union from formulating a "complete economic proposal through most of the voluntary bargaining period."  The ALJ rejected Gerawan's claim that the Union's failure to submit an economic proposal prior to the July 21, 2013 bargaining session inhibited the parties' progress toward an agreement.

Despite Gerawan's assertion in its November 2012 letter that it would work with the Union in good faith to reach an agreement, the ALJ found Gerawan's bargaining conduct established no such thing.  First, Gerawan ignored the Act's "rudimentary bargaining obligations when granting the interim wage increases during the 2013 season."  The ALJ determined Gerawan's conduct with respect to the March 2013 wage increases was "compelling evidence of its extreme bad faith approach to its bargaining efforts in 2013."

As for the parties' conduct at the bargaining table, the ALJ found Gerawan advanced proposals it obviously knew the Union would never accept, including the right to work, economic action and union obligation/insurance proposals, which was a significant indicium of bad faith bargaining.  Gerawan insisted on the first two proposals "into the final stages of the MMC process and, save for the lowered insurance demands it negotiated with itself because the Union refused to even consider this proposal from the outset, all three remained unchanged throughout the bargaining process."  Moreover,

these proposals were "clearly grounded on [Gerawan's] own personal and very self-serving philosophy of freedom of choice," and sought to impose special qualifications on the Union to satisfactorily qualify as a proper representative of Gerawan's employees, in violation of the ALRA and NLRA. Gerawan's "rigid adherence" to these proposals was further evidence of its bad faith surface bargaining.

The ALJ also noted Gerawan's union obligation proposal, as well as its proposal to exclude FLC workers from coverage under the agreement, were not mandatory subjects of bargaining. While the ALJ recognized Gerawan agreed to include FLC workers under the grievance/arbitration provision, he found that amounted to a "hollow concession" since it would be up to the farm labor contractor to determine the other terms and conditions of employment. Since those contractors have no duty to bargain with the Union, the effect of Gerawan's proposal was to exclude FLC workers from the terms of any agreement reached. In addition, it was difficult to perceive how the Union could compel a farm labor contractor to arbitrate violations of the terms of employment. The ALJ concluded that by insisting on resolution of these nonmandatory subjects of bargaining, Gerawan was using these proposals as a "device to prevent an agreement."

The ALJ rejected as meritless Gerawan's assertion that it insists on all vendors providing proof of insurance in order to enter its property. The ALJ explained the Union is the employees' representative, not a vendor, and all of its " 'rights' flow from the legal protection accorded to those agricultural workers who freely selected that labor organization by a majority vote in a lawful election." Since the workers could not be required to buy liability insurance from an approved provider in order to enter Gerawan's property, it followed their representative need not do so. Accordingly, the ALJ found Gerawan violated its duty to bargain in good faith by its insistence on an indemnification/ insurance proposal and the exclusion of FLC workers from the core benefits of a collective bargaining agreement.

In sum, the ALJ found the record supported the conclusion Gerawan engaged in bargaining with no intention of ever reaching an agreement with the Union and by persistently refusing to bargain concerning the employment status concerning the employment terms of FLC workers.

### C.    The Board's Order

The Board affirmed the ALJ's factual findings and legal conclusions. With respect to the right to work proposal, the Board concluded Gerawan opposed the Union's proposal, and maintained its rigid adherence to its own proposal, "based solely on its philosophical opinions as to its employees' free choice rights and its fervent opposition to the UFW's status as its employees' exclusive bargaining representative." The Board noted Gerawan never truly considered the Union's proposal and made no effort to assess the costs of implementing a check-off system.

With respect to Gerawan's economic action proposal, the Board found the Union "reasonably perceived Gerawan's highly unorthodox proposal as an attempt to undermine its status as the employees' bargaining representative." The Board concluded this proposal was "inimical to labor peace and the underlying policies and purposes of the ALRA" and NLRA, and undermined any argument the proposal was advanced in good faith with a genuine intent to reach agreement.

The Board agreed with the ALJ that Gerawan's union obligations proposal was not a mandatory subject of bargaining, and therefore insisting on the proposal to impasse was a violation of the duty to bargain in good faith and properly considered in a totality of the circumstances analysis. The Board found Gerawan's stated rationale for the proposal was further evidence of its bad faith in insisting on it, as Gerawan's fear that the Union might cause damage to its property was "entirely speculative" and Gerawan was attributing "nefarious intentions" to the Union. The Board explained the record supported the ALJ's finding that Gerawan exhibited several of the hallmark indicia of bad faith, including its delay in providing information, making unreasonable bargaining

40.

demands, making unilateral changes in mandatory subjects of bargaining, and engaging in efforts to bypass the Union.

The Board considered Gerawan's other bargaining proposals and positions. The Board found unconvincing Gerawan's rationale for resisting the Union's just cause proposal, as Barsamian surely must have been familiar with the term and instead of attempting to provide its own definition of the term, Gerawan feigned ignorance. The Board further found Gerawan's position on the just cause proposal provided further evidence that it was not open to agreement or true give-and-take required by the good faith bargaining duty.

The Board found unconvincing Gerawan's argument that the ALJ failed to consider concessions it made. The Board recognized Gerawan offered concessions on seniority by being willing to consider "length of service" in the context of layoffs and recalls, as well as filling positions due to vacancy or promotional opportunity. These "limited concessions," however, did not defeat the surface bargaining allegations in the context of totality of the circumstances. With respect to the grievance-arbitration provision, the Board explained that while Gerawan may have made more movement on the issue than the Union, Gerawan's starting point, namely, that Gerawan determined all employee grievances itself, allowed for the most movement. The Board concluded on the record before it these concessions were not sufficient to detract from Gerawan's positions on the other provisions, "which we find demonstrate a strategy by Gerawan to frustrate the possibility of reaching agreement."

The Board also considered Gerawan's conduct away from the bargaining table. The Board upheld the ALJ's findings that Gerawan's unreasonable delay in furnishing economic information the Union requested and its conduct surrounding the March 2013 wage increases were further evidence of Gerawan's lack of good faith.

With respect to the FLC workers, the Board affirmed the ALJ's conclusion that Gerawan's insistence on removing them from the scope of any collective bargaining

41.

agreement and its persistent refusal to bargain over their wages, hours, and terms and conditions of employment, violated section 1153, subdivision (e).

### D. Surface Bargaining

The duty to bargain means more than merely demonstrating a willingness to meet and talk; rather, it requires a party "to enter discussions with an 'open and fair mind, and a sincere purpose to find a basis of agreement.' " (*NLRB v. Big Three Industries*, *Inc.* (5th Cir. 1974) 497 F.2d 43, 46; *J.P. Stevens & Co.*, *Inc.* (1978) 239 NLRB 738, 749, 762–763.) A party, however, may engage in " 'hard bargaining to achieve a contract that it considers desirable[,]' " and thus "is entitled to stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force the other party to agree." (*Atlanta Hilton & Tower* (1984) 271 NLRB 1600, 1603; *NLRB v. Advanced Business Forms Corp.* (2nd Cir. 1973) 474 F.2d 457, 467.)

There is a difference between surface bargaining and hard bargaining. "The former, which violates the Act's requirement that parties negotiate in good faith, is defined as ' "going through the motions of negotiating," without any real intent to reach an agreement.' [Citation.] 'Hard bargaining,' on the other hand, is found where a party genuinely and sincerely insists on provisions that the other party deems unacceptable, even though it may produce a stalemate. [Citations.] … '[G]ood faith bargaining does not require that [a company] make proposals that are acceptable to [the union]…. A lack of good faith … may be found only from "conduct clearly showing an intent not to enter into a contract of any nature." ' " (*Dal Porto*, *supra*, 163 Cal.App.3d at p. 549.)

The Board and NLRB consider the totality of the circumstances to determine whether a party's conduct, as a whole, both at and away from the bargaining table, demonstrates a violation of the duty to bargain in good faith. (*Regency Service Carts*, *Inc.* (2005) 345 NLRB 671; *McFarland Rose Production*, *Inc.* (1980) 6 ALRB No. 18, p. 4.) Thus, the Board looks to the entire course of bargaining rather than examining individual negotiating sessions or proposals in isolation. (*Altorfer Machinery Co.* (2000)

332 NLRB 130, 160 ["negotiations must be viewed in their totality, so that isolated events, proposals and counterproposals are not accorded undue weight, which is not truly reflective of the entirety of the process" (*Altorfer Machinery*)]; *McFarland Rose Production*, *Inc.*, at p. 23 ["Surface bargaining is a violation which occurs over an extended period of time and it cannot be analyzed by examining individual bargaining sessions or positions in isolation from the totality of the parties' conduct."].)

In evaluating the totality of the circumstances, the NLRB "has enumerated specific areas to which it looks: delaying tactics, unreasonable bargaining demands, unilateral employment changes, efforts to bypass employees' bargaining representative, failure to designate an agent with sufficient bargaining authority, withdrawal of agreed-upon proposals, and arbitrary scheduling of meetings, as well as conduct occurring away from the bargaining table." (*Altorfer Machinery*, *supra*, 332 NLRB at p. 148, citing *Atlanta Hilton & Tower*, *supra*, 271 NLRB at p. 1603.) The totality of the circumstances "includes a consideration of the union's conduct." (*Carl Joseph Maggio*, *Inc. v. Agricultural Labor Relations Bd.* (1984) 154 Cal.App.3d 40, 71.)

"The problem in resolving a charge of bad faith bargaining is to '*ascertain the state of mind of the party charged*, insofar as it bears upon that party's negotiations.' [Citation.] State of mind is a question not of law but of fact, and is most often established by circumstantial evidence. [Citations.] Absent evidence of specific conduct which constitutes a per se violation of a duty to bargain in good faith, 'the determination of intent must be founded upon the party's overall conduct and the totality of the circumstances ....' [Citation.] As was said in *Labor Board v. Truitt Mfg. Co.* (1956) 351 U.S. 149, 155: 'A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching

43.

such a determination.' (Frankfurter, J. conc./dis. opn.)" (*Dal Porto*, *supra*, 163 Cal.App.3d at p. 549.)

"Although individual actions standing alone may be insufficient to demonstrate bad-faith bargaining, these actions must be considered a part of the totality of circumstances in determining whether a [party] has engaged in surface bargaining." (*Altorfer Machinery*, *supra*, 332 NLRB at p. 130, fn. 2.) While a negotiating party is not required to accept a particular proposal or make a particular concession, "a party's consistent refusal to make an informed assessment of the other party's proposal, coupled with a consistent rejection of the other party's efforts to make its proposal more acceptable to the party, may give rise to an inference that the party is not interested in reaching agreement but is merely 'going through the motions of negotiating.' " (*Dal Porto*, *supra*, 163 Cal.App.3d at p. 551.) Although the Board is prohibited from drawing an inference of bad faith bargaining from an employer's mere act of rejecting a union proposal, an employer who refuses to evaluate that proposal has rejected its duty to participate in the bargaining process. (*Id.* at p. 552.)

In challenging the Board's order, Gerawan contends the Board failed to consider the Union's nearly 17-year absence in its totality of the circumstances analysis, which sheds light on the basis for Gerawan's contract proposals. Gerawan asserts that even if an employer's proposal is evidence of bad faith in the context of an on-going union relationship, the same proposal made after a union's long disappearance, where the union's demands upset longstanding business practices, and raised serious questions and concerns among the workers, is not.

As we recognized in *Gerawan II*, the Union's sudden reappearance, claiming to be the workers' rightful bargaining representative, seeking a contract, and ultimately pursuing MMC, was a "*major* change of circumstances" and constituted a "dramatic shift from the long-term status quo" that "profoundly affected" Gerawan and its workers. (*Gerawan II*, *supra*, 23 Cal.App.5th at p. 1207.) But as the Board noted in its decision,

by indicating its willingness to enter into negotiations with the Union and respond to its information requests, and proceeding to do both, Gerawan conceded the Union's status as its employees' certified bargaining representative, and therefore waived any argument the Union no longer retained its certified status. (See *Technicolor Government Services*, *Inc. v. NLRB* (8th Cir. 1984) 739 F.2d 323, 327 [when "employer honors a certification and recognizes a union by entering into negotiations with it, the employer has waived the objection that the certification is invalid"]; *Brown & Connolly*, *Inc.* (1978) 237 NLRB 271, 275 [employer demonstrates its acceptance of a union's representational status by commencing negotiations]; § 1153, subd. (f).)

Thus, while the Union's absence may be considered when weighing the reasonableness of Gerawan's proposals, Gerawan cannot defend its bargaining positions and proposals based on its belief it was able to represent its employees' interests better than the Union. (See *Summer Peck Ranch*, *Inc.* (1984) 10 ALRB No. 24, pp. 9–10 ["resisting union proposals 'in the interest' of the employees and in order to preserve a 'family-like' relationship between employer and employee displays a basic lack of acceptance" of the union's role and is "incompatible with good faith bargaining"]; *Montebello Rose Co.*, *Inc.* (1979) 5 ALRB No. 64, p. 24 [employer's desire to protect their employees from the union's arbitrary action demonstrates a failure to accept a basic principle of the ALRA—that the certified collective bargaining representative is the employees' exclusive representative, which is a role the employer may not assume]; *As-H-Ne Farms*, *Inc.* (1980) 6 ALRB No. 9, p. 5 [employer may not justify refusal to provide employee addresses to the union on the ground it was protecting employees' privacy rights]; *J.R. Norton Company* (1982) 8 ALRB No. 89, p. 25 [in light of employer's overall bargaining conduct, its objection to union security clause based on fear of potential for abuse in giving union sole discretion for determining a worker's good standing, indicated bad faith, because it demonstrated a failure to accept the union as the employees' exclusive representative].)

Gerawan also asserts the Board's order improperly rests on the substance of Gerawan's proposals. It is true that the Board " 'may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " (*H.K. Porter Co. v. NLRB* (1970) 397 U.S. 99, 106.)

The Board, however, is not prohibited from examining the contents of the parties' proposals, as it "must take some cognizance of the reasonableness of the position taken by an employer in the course of bargaining negotiations" if it is not to be "blinded by empty talk and by the mere surface motions of collective bargaining …." (*NLRB v. Reed & Prince Mfg. Co.* (1st Cir. 1953) 205 F.2d 131, 134–135; see *NLRB v. F. Strauss & Son, Inc.* (5th Cir. 1976) 536 F.2d 60, 64; *NLRB v. Holmes Tuttle Broadway Ford, Inc.* (9th Cir. 1972) 465 F.2d 717, 719.) Inferences drawn from the proposals are not alone sufficient to support a violation of the obligation to bargain in good faith; the Board also " 'must show "substantial evidence that the company's attitude was inconsistent with its duty to seek an agreement." ' " (*Seattle-First Nat'l Bank v. NLRB* (9th Cir. 1981) 638 F.2d 1221, 1226.)

With these principles in mind, we consider Gerawan's arguments with respect to the Board's consideration of the parties' bargaining positions to determine whether the Board's findings are supported by substantial evidence and deference should be given to the inferences it drew.

### 1. Right to Work

The Union's initial proposal included a union security provision establishing an agency shop, which required employees to become Union members or pay an agency fee, and provided for a check-off system for collecting dues and fees. As the Board asserts, these are common provisions in collective bargaining agreements to facilitate the collection of due and fees, and generally are intended to alleviate the concern posed by "free riders." (See *NLRB v. General Motors Corp.* (1963) 373 U.S. 734, 741, 744.)

Gerawan countered with its "Right to Work" proposal, which provided for an open shop in which Union membership was not required. While Gerawan asserts this was not an "unorthodox" proposal, given Barsamian's many years of labor law experience, it was reasonable for the Board to infer that Gerawan would have been aware the term was "commonly regarded as anathema to labor organizations."[18]

Gerawan adhered to its proposal throughout the course of negotiations based on its philosophical opinions about its employees' free choice rights and its opposition to the Union's status as its employees' collective bargaining representative. The Board reasonably found Gerawan's stated rationale and unwillingness to move on even the name of its proposal evidenced its lack of intent to reach agreement on this issue. "Where, as here, the employer adamantly opposes union security and checkoff on vague or generalized 'philosophical' grounds or questionable assertions of policy, the inference is warranted that the Employer entered negotiations with a fixed intention not to consider or agree to any form of union security or checkoff," in violation of its duty to bargain in good faith. (*Chester County Hospital* (1995) 320 NLRB 604, 622; see *Universal Fuel, Inc.* (2012) 358 NLRB 1504, 1521 ["opposition to union security and dues checkoff based on philosophical grounds without business justification has been held to constitute evidence of bad-faith bargaining"].)

While, as Gerawan asserts, there is nothing in the ALRA that compels the use of union security agreements, leaving the parties free to accept or reject them (*Pasillas v. Agricultural Labor Relations Bd.* (1984) 156 Cal.App.3d 312, 344), Barsamian admitted he was not aware of any open shop UFW contract in California.[19] Gerawan asserts it was within its rights to resist a proposal that would allow the Union to be the "sole judge" of

---

[18] As the Board noted, the mediator who presided over the MMC proceedings recognized "[t]he very title to this Article suggested by [Gerawan] and its invidious connotation is predictably unacceptable to the Union."

[19] The mediator found that union security clauses were the rule rather than the exception in agricultural labor contracts.

47.

who it could hire or fire, and it had a legitimate business justification for its position, namely, that it was concerned employees who were "forced to pay dues to a union they knew nothing about might quit rather than do so." But Gerawan never presented these arguments during negotiations or raised them before the Board. Belated and shifting "justifications" may demonstrate the pretextual nature of an employer's bargaining conduct. (*Giannini Packing Corp.* (1993) 19 ALRB No. 16, p. 17 [presenting shifting and inconsistent explanations for decisions constitutes "strong circumstantial evidence of the existence of an undisclosed and forbidden motive"]; *Peter Scalamandre & Sons*, *Inc.* (2000) 330 NLRB 1191, 1197 [the NLRB "has long held that unlawful motivation may be found where an employer provides false or shifting reasons for its actions"].)

Gerawan cites several cases as examples of the NLRB declining to infer bad faith when an employer opposes a union security provision as a matter of principle. Those cases, however, are distinguishable. In *WCUE Radio*, *Inc.* (1974) 209 NLRB 181, 188–189, the NLRB declined to infer bad faith where, in rejecting the union's request for a union or agency shop, the employer explained to the union it was opposed to union-security agreements as a matter of principle and believed such a provision would hamper its ability to recruit new talent, although it might be willing to grant a checkoff of union dues. In contrast here, Gerawan never gave the Union a business justification for opposing the agency shop proposal and opposed any form of checkoff. In the other cases Gerawan cites, although the employers firmly opposed union or agency shop clauses, they made concessions on other terms or the parties reached agreement on many terms. (See *Pacific Mushroom Farm* (1981) 7 ALRB No. 28, ALJD at pp. 18–19; *Church Point Wholesale Grocery Co.* (1974) 215 NLRB 501–502.)

Gerawan's failure to offer a business justification for its opposition to the Union's proposal and to make any effort to assess the costs of implementing a checkoff system is

48.

indicative of bad faith bargaining.[20] (See *Dal Porto*, *supra*, 163 Cal.App.3d at pp. 551–552.) Gerawan points to the mediator's discussion of this issue in his report as supporting its opposition to an agency shop. While the mediator recognized the Union's absence had raised a thorny issue, as "[a]ll other things being equal, the imposition of membership fees to support an organization that most of the Employer's employees have had little if anything to do with would appear to be a bit of an overreach," the mediator determined all things were not equal. Instead, the mediator, in adopting the Union's proposal in its entirety, found Gerawan's perspective on union dues and fees "is cast in dark tones and ascribes to the Union some nefarious, self-serving purpose in collecting them"; Gerawan presumed to speak on the employees' behalf, "which in itself is a conflict of interest, claiming that the Union's bargaining efforts are 'unwanted' "; and in the face of directly contradictory statutory language in sections 1153, subdivision (c) and 1154, subdivision (b), Gerawan asserted the "imposition of agency fees was inconsistent with the ALRA's protections of freedom of association and self-organization."

In sum, substantial evidence on the record considered as a whole supports the Board's finding that "Gerawan opposed the UFW's request and maintained its own rigid adherence to its 'Right to Work' proposal based solely on its philosophical opinions as to its employees' free choice rights and its fervent opposition to the UFW's status as its employees' exclusive bargaining representative. It never truly considered the UFW's proposal, and admittedly took no effort to assess what the costs, if any, of implementing a check-off system would be." The Board's inference that Gerawan's conduct with respect to this provision evidenced an effort to frustrate the parties' ability to reach a voluntary collective bargaining agreement was neither "irrational," "tenuous," nor "unwarranted." (*Penasquitos Village*, *supra*, 565 F.2d at p. 1079.)

---

[20]  Gerawan asserts its opposition to the agency shop provision was not based primarily on how the fees would be deducted, but rather "*whether* compulsory agency fees could be compelled by the state." That was not the justification it gave the Union for opposing the fees, however.

## 2. Economic Action

The Board found Gerawan did not advance its economic action proposal, which would have allowed its employees to take any "lawful economic action," in good faith because: (1) its rationale for the proposal was rooted in its "freedom of choice" philosophy; (2) the Union reasonably perceived the proposal as an attempt to undermine its status as the employees' bargaining representative; and (3) the proposal was directly contrary to the purpose of a collective bargaining agreement, namely, to ensure labor peace and minimize or eliminate disruptions caused by labor disputes.

Gerawan asserts the Board failed to consider the effect of the Union's "no-strike/ no-lockout clause on the employees' right to choose their bargaining representative." Gerawan argues the Union's no strike provision was self-serving and conflicted with the employees' freedom of choice because it would have prevented employees from protesting against the Union or supporting a decertification effort. Gerawan maintains it sought to protect its employees' statutory right to strike through its economic action provision. As discussed above, Gerawan's attempt to cast itself as the employees' representative is incompatible with good faith bargaining, and supports an inference that its proffered justification for its provision was made in bad faith.

A union may waive the right to strike as the quid pro quo for the employer's acceptance of the grievance and arbitration procedure. (*NLRB v. Magnavox Co.* (1974) 415 U.S. 322, 325.) That is what the Union was attempting to do here. Gerawan appears to argue the Union did not have the right to bargain away the statutory rights of its workers because the current employees did not select it, citing selective language from *Mastro Plastics Corp. v. NLRB* (1956) 350 U.S. 270, 280.[21] As we have discussed,

---

[21] In that case, the United States Supreme Court, in deciding whether the parties' collective bargaining agreement waived the employees' right to strike against the employers' unfair labor practices, observed that waivers of employees' right to strike generally contribute to the normal flow of commerce and the maintenance of regular

however, the Union was the employees' elected representative, despite its long absence and regardless of whether the current employees voted for it; as the exclusive bargaining representative, the Union had the right to propose a waiver of the employees' right to strike in exchange for a grievance and arbitration procedure.

Moreover, the Board reasonably found Gerawan's economic action proposal was contrary to the purpose of a collective bargaining agreement, thereby undercutting Gerawan's position that it advanced this proposal in good faith. (*H.J. Heinz Co. v. NLRB* (1941) 311 U.S. 514, 524 [collective bargaining agreement is "regarded as the effective instrument of stabilizing labor relations and preventing, through collective bargaining, strikes and industrial strife"].) In enacting the ALRA, the Legislature "specifically declared the collective bargaining process is the preferred method for attempting to bring peace and stability to California's agricultural fields." (*Ruline Nursery Co. v. Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 253, citing *Agricultural Labor Relations Bd. v. Superior Court*, *supra*, 16 Cal.3d at p. 403.) Similarly, labor peace is the overriding goal of the NLRA, which "is promoted when the parties to a labor dispute avoid a test of strength involving a strike or a lockout by negotiating a collective bargaining agreement, which will standardly include a no-strike clause, thus assuring labor peace during the term of the agreement …." (*Duffy Tool & Stamping*, *L.L.C. v. NLRB* (7th Cir. 2000) 233 F.3d 995, 997.)

As the NLRB has explained, one of the NLRA's primary objectives "is to utilize collective-bargaining contracts as a means for minimizing, if not eliminating, disruptions to the free flow of commerce caused by labor disputes. Obviously, strikes are one such disruption[]." (*Altorfer Machinery*, *supra*, 332 NLRB at p. 165.) In *Altorfer Machinery*, the NLRB criticized an employer's strike proposal, finding it "contemplates the very type of conduct which is inherently disruptive of the free flow of commerce" and "presents the

---

production schedules, "[p]rovided the selection of the bargaining representative remains free." (*Mastro Plastics Corp. v. NLRB*, *supra*, 350 U.S. at p. 280, italics omitted.)

prospect of ongoing labor dispute and incident disruption." (*Ibid.*) Similarly, here, as the Board reasonably found, Gerawan's proposal "was so far contrary to the fundamental purposes of the ALRA as to undermine any argument that the proposal was advanced in good faith with a genuine intent to reach agreement."[22]

### 3.    Union Obligations

Gerawan's union obligations proposal would have required the Union to indemnify Gerawan from any claims, losses or damages it may incur when performing under the agreement, and to carry certain forms of insurance. As the Board found, and Gerawan concedes, this was not a mandatory subject of bargaining because it did not relate to the employees' wages, hours, or terms and conditions of employment. (§ 1155.2, subd. (a); *Arlington Asphalt Co.* (1962) 136 NLRB 742, 745, enfd. *sub nom. NLRB v. Davison* (4th Cir. 1963) 318 F.2d 550, 557.) The NLRB and courts "have consistently treated a contract requirement of a performance bond or financial indemnity agreement proposed by either employer or union for the other, as a nonmandatory subject of bargaining, and have held that employer or union insistence to impasse on such a requirement was a violation of the obligation to bargain in good faith." (*Covington Furniture Mfg. Corp.* (1974) 212 NLRB 214, 217–218, enfd. (6th Cir. 1975) 514 F.2d 995; see *NLRB v. Wooster Div. of Borg-Warner* (1958) 356 U.S. 342, 349 [employer's refusal to enter into an agreement on the ground it does not include a nonmandatory bargaining subject, "is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining"].)

Gerawan asserts there is no evidence it refused to agree to any mandatory subject of bargaining until the Union accepted the nonmandatory union obligations proposal. Gerawan further asserts that because this proposal was outside the scope of the issues the

---

[22] The mediator similarly noted, when considering Gerawan's economic action proposal, "[n]othing could be more antithetical to the preservation of peace and stability in labor relations than to allow the parties to resort to economic warfare during the term of their collective bargaining agreement."

mediator was permitted to include in his report, the proposal could not have stymied negotiations and cannot serve as evidence of an intent to avoid an agreement, particularly since the Union rejected the proposal and the mediator excluded it from the terms imposed.

The evidence shows, however, that the parties discussed this proposal throughout the negotiations and Gerawan insisted on its inclusion, even arguing to the mediator that the proposal should be included in the parties' contract. The mediator did not exclude the proposal from the contract because he was not permitted to do so; instead, he rejected the proposal on the merits. The mediator found there was no evidence to support Gerawan's assertions that the Union's conduct or economic situation justified inclusion of the proposed term. Noting that the parties had agreed not to interfere with each other's internal business, the mediator determined Gerawan's suggestion that the Union obtain various types of insurance directly contravened this language. The mediator further determined the hold harmless provision was overbroad and incomprehensible and, as the Union pointed out, the proposal was highly unusual and not found in any of its labor agreements.

The Board found the ALJ properly considered Gerawan's conduct with respect to this proposal in his totality of the circumstances analysis. That conduct included seeking to impose on the Union "the equivalent of a pay-to-play requirement," contrary to the ALRA, which does not require a certified labor organization to post security in favor of an employer as a condition of exercising its rights under the ALRA, including the right of access to the employer's premises. (See Cal. Code Regs., § 20900.) The NLRB found "convincing evidence" of an employer's "inclination to engage in no more than nominal bargaining" where the employer "treated the Union as an intruder, one which required some watching after, rather than as a statutorily invited guest on the premises." (*J.P. Stevens & Co., Inc.*, *supra*, 239 NLRB at p. 769.) The Board reasonably found Gerawan's proposal reflected a similar disposition.

In addition, the ALJ found Gerawan sought to impose special qualifications on the Union before it could qualify as the employees' proper representative, which was a status the Union had already attained by virtue of its prior certification. As the ALJ stated, "[n]othing in any labor relations statute authorizes an employer to impose its own qualification standards on the employee representative. Indeed, Section 1153(b) of the ALRA and [29 United States Code section 158(a)(2)] of the NLR[A] prohibit employers from doing just that in order to protect the right of employees to independent representation."

An employer's "insistence on extreme or unreasonable proposals can be part of the evidence in determining whether demands made by a particular party was designed to frustrate agreement in the collective-bargaining process." (*McDaniel Ford*, *Inc.* (1997) 322 NLRB 956, 965.) The Board reasonably found Gerawan's insistence on this unusual proposal, when considered in combination with Gerawan's other conduct, supported a finding of overall bad faith bargaining.

### 4. Just Cause

The Board found Gerawan's position with respect to the Union's just cause proposal was "further evidence of a mindset not open to agreement or true give-and-take" required by the duty to bargain in good faith. Gerawan contends it never rejected the proposal, but rather was merely asking for clarification of the "just cause" standard which, if left undefined, would give an arbitrator the power to define the term. (See *Conoco*, *Inc. v. Oil*, *Chemical & Atomic Workers Int'l Union* (N.D. Okla. 1998) 26 F.Supp.2d 1310, 1317.)

The Board found Gerawan's rationale for resisting the just cause proposal was unconvincing, given that the term is not foreign to practitioners in the field of labor law and labor relations, or to labor arbitrators who often are called upon to apply it. (See *Show Industries*, *Inc.* (1993) 312 NLRB 447, 455 [just cause standard for disciplinary action is a common feature of a typical collective-bargaining agreement]; *Prentice-Hall*,

*Inc.* (1988) 290 NLRB 646, 669 [noting that just cause is a "well-recognized and well-defined standard"]; see also *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.* (1989) 880 F.2d 846, 848, fn. 1 ["As is the usual circumstance in collective bargaining agreements, the contract did not define 'just cause' "].)  The Board also found by not attempting to provide its own definition of just cause, and instead feigning ignorance of its meaning and insisting the Union define it, Gerawan reflected "shadow boxing" or "giving the Union a runaround" that has been found to constitute a refusal to bargain. (See *NLRB v. Herman Sausage Co.* (5th Cir. 1960) 275 F.2d 229, 232 (*Herman Sausage*).)

The evidence supports the Board's findings.  While Barsamian testified Gerawan never rejected the just cause standard and merely asked for a definition of it, Gerawan proposed an at-will standard throughout the negotiations, a position it never moved from. Initially Gerawan proposed it had "the right to hire, promote, discharge or discipline" pursuant to its historical practice of at-will employment.  Eventually Gerawan made the following counterproposal to the Union's discipline and discharge proposal:  "The company retains the right to discipline or discharge employees pursuant to federal and state law and the terms of this Agreement."  Gerawan asserts it provided "numerous modifications" to this counterproposal, but the record shows the counterproposal remained the same throughout the negotiations.  Barsamian's claim that he was uncertain of the meaning of just cause is undermined by the inclusion of just cause or for cause limitations in Gerawan's management rights proposals at the beginning and end of negotiations, which Gerawan claimed were included in error.[23]

_____

[23]     Gerawan asserts it "proposed various formulations of the just cause standard." Gerawan points to Barsamian's testimony, in which he confirmed he was aware there were legal treatises that would provide some guidance on the meaning of just cause and said that after he talked about the standard with Elenes, he quoted a couple of those treatises in letters to the general counsel's partner and asked if that was what he meant, but never received a response.  It is unclear, however, when this communication

55.

The Board reasonably found Gerawan's position with respect to the Union's just cause proposal provided further evidence it was not making real efforts to enter into an agreement. (*A-1 King Size Sandwiches*, *Inc.* (1982) 265 NLRB 850, 859 [employer's efforts "to retain exclusive and unbridled control over discipline and discharge and both layoff and recall" factored into finding of bad faith bargaining], enfd. *sub nom. NLRB v. A-1 King Size Sandwiches*, *Inc.* (11th Cir. 1984) 732 F.2d 872, 876 [describing union's just cause proposal as "a common non-controversial clause"].)

### 5.    Gerawan's Concessions

Gerawan contends the Board ignored concessions and modifications it made to its seniority and grievance and arbitration proposals, and failed to consider the significance of them.

With respect to the seniority proposal, the Board explained that while Gerawan made some concessions by offering to consider length of service in the context of layoffs, recalls, and filling job vacancies, its limited concessions did not defeat the surface bargaining allegations based on the totality of the circumstances. The Board viewed these concessions as creating the impression of serious bargaining while making no real effort to conclude an agreement. (*McFarland Rose Production*, *Inc.*, *supra*, 6 ALRB No. 18, p. 28; *Herman Sausage*, *supra*, 275 F.2d at p. 232 ["to sit at a bargaining table … or to make concessions here or there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail"].)

With respect to the grievance and arbitration provision, the Board was not persuaded Gerawan's concessions were as noteworthy as it portrayed them. Noting that grievance-arbitration is a common feature in collective bargaining agreements and serves as "[a] major factor in achieving industrial peace" (*United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960) 363 U.S. 574, 578), the Board found that while

occurred; Barsamian testified it occurred when "the new set of negotiations [] started up" in 2015.

56.

Gerawan may have made more movement on this issue than the Union, its starting point, namely, that Gerawan would determine employee grievances itself, allowed for the most movement.

While Gerawan ultimately adopted nearly all of the Union's proposed language, it was reasonable for the Board to conclude this was not notable since Gerawan's initial proposal was so far removed from a standard grievance provision. The Board also reasonably could find that Gerawan's concessions were not sufficient to detract from its rigid positions on the right to work, economic action, and union obligations proposals, as well as its resistance to the Union's basic just cause proposal, which evidenced a strategy to frustrate the possibility of reaching a voluntary collective bargaining agreement. (See *Altorfer Machinery*, *supra*, 332 NLRB at p. 150, citing *NLRB v. Big Three Industries*, *Inc.*, *supra*, 497 F.2d at p. 46.)

### 6. Conduct Away from the Bargaining Table

The Board determined Gerawan's delay in providing information to the Union and its March 2013 interim wage increases, as well as the flyers informing employees of the increases, provided further evidence of bad faith bargaining. Gerawan challenges only the Board's finding with respect to the interim wage increases, namely, that Gerawan did not give the Union a meaningful opportunity to bargain over them, arguing it did not have such an obligation.

An employer violates its duty to bargain when it implements unilateral changes in the terms and conditions of employment. (*NLRB v. Katz* (1962) 369 U.S. 736, 743.) "[W]hen, as here, the parties are engaged in negotiations, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole." (*Bottom Line Enterprises* (1991) 302 NLRB 373, 374, emphasis omitted.) Unilateral changes in mandatory subjects of bargaining are among the conduct that is

57.

indicative of a lack of good faith.  (*Atlanta Hilton & Tower*, *supra*, 271 NLRB at p. 1603.)

Gerawan announced hourly pay raises through flyers that informed employees the decisions to grant pay raises were from "Ray, Mike, and Dan Gerawan," who "made the decision to give cultural labor employees a raise just as they always have," and "informed the union of our proposed plan, and we assume they will not cause any unnecessary delay."  The Board agreed "with the ALJ that Gerawan gave the UFW notice of a *fait accompli*, not a meaningful opportunity to bargain, that presented the union the Hobson's choice to quickly accept Gerawan's terms or face further disparagement by it."  (See *Champion International Corp.* (2003) 339 NLRB 672, 678–688; *S & I Transportation*, *Inc.* (1993) 311 NLRB 1388, fn. 1; *J.P. Stevens & Co.*, *supra*, 239 NLRB 738 [employer presented the union with a " 'Hobson's choice'—either accept or reject unilaterally predetermined modifications in benefit programs"; "this tactic was a most effective means of undermining the collective-bargaining process and denigrating the Union's status as collective-bargaining agent"].)

Gerawan contends this conclusion was erroneous because "[w]age changes that merely reflect continuations of past company policy are not considered changes in existing work conditions, and thus fall outside the *Katz* rule."  (*Aaron Brothers Co. v. NLRB* (9th Cir. 1981) 661 F.2d 750, 753; see *NLRB v. Southern Coach & Body Co.* (5th Cir. 1964) 336 F.2d 214, 217–218 [promotions necessitated by a strike, which did not involve discretionary pay raises, did not violate *Katz* rule; the NLRA does not  prohibit an employer from making necessary work force adjustments in the absence of evidence of deviation from established company policy or refusal to bargain with respect to the standards to be used for promotion].)

Gerawan claims the wage increases were made pursuant to its "established practice of providing competitive wage increases and the business necessity underlying its wage increases."  It cites no evidence, however, to show a past practice of providing

automatic wage increases on a regular basis as part of an established company policy. Elenes testified Gerawan told him, when discussing the wage proposal, that they were raising wage rates because "some of their competitors were raising rates and they wanted to stay above the competition." This testimony, however, does not establish that Gerawan had an established policy of raising wages to stay ahead of the competition. The Board reasonably could find, based on the flyers, that the raises were made, not to stay above the competition, but rather as part of "a strategy to undermine the union in the eyes of the employees" by depicting the Union "as an obstacle to Gerawan's ability to bestow its good will on the employees," and portray itself "as the benefactor of its employees."[24]

The mediator's report, which Gerawan cites, also does not establish there was a set policy of wage increases; instead, it shows the discretionary nature of the raises. When discussing wages, the mediator noted the minimum wage was the driving force for wage levels in California agriculture absent union representation, and Gerawan's 10-year wage history demonstrated that in certain instances, but not all, Gerawan paid more than the minimum wage. The mediator noted the two March 2013 increases implemented within a week of each other occurred in the context of renewed bargaining with the Union, and "[t]he rationale for raising wages so dramatically at that time cannot simply be explained as a desire to remain in 'the forefront' of agricultural labor compensation providers or by a need to attract the best workers." Thus, the mediator actually found the raises at issue were not linked to any policy, and instead were discretionary.

---

[24] In *Gerawan II*, we concluded there was substantial evidence to support an unfair labor practice charge based on direct dealing relating to the flyers announcing the March 2013 pay raise, as "[r]easonably implicit in this message to its employees was that Gerawan was granting the pay raises entirely on its own, apart from the union, and that it was hoped that the union would not delay or get in the way of what Gerawan alone was doing for them." (*Gerawan II*, *supra*, 23 Cal.App.5th at p. 1211.)

Based on the record as a whole, the Board reasonably could find Gerawan's conduct surrounding the March 2013 wage increases further evidenced Gerawan's lack of good faith in bargaining towards a collective bargaining agreement. (*Montebello Rose Co.*, *Inc.* (1979) 5 ALRB No. 64, p. 25 [" 'Conduct reflecting … an underlying purpose to bypass or undermine the union … manifests the absences of a genuine desire to compromise differences and to reach agreement in the manner the Act commands.' "]; *Akron Novelty Mfg. Co.* (1976) 224 NLRB 998, 1001.)[25]

### 7. Conclusion

In sum, the Board's findings are supported by substantial evidence on the record considered as a whole. While the Union's sudden reappearance after a 17-year absence created a "dramatic shift from the long-term status quo" that "profoundly affected both Gerawan and its workers" (*Gerawan II*, *supra*, 23 Cal.App.5th at p. 1207), Gerawan had

---

[25] The Board also addressed Gerawan's contention that the ALJ erred in citing to the Board's findings in *Gerawan Farming*, *supra*, 42 ALRB No. 1, in which the Board found Gerawan committed unfair labor practices related to the decertification election, because an appeal of that decision was pending in this court. In rejecting the argument, the Board noted that while the ALJ did not specifically rely on the Board's findings of unlawful support and assistance to the decertification effort, solicitation of grievances, and employee direct dealing it made in its prior decision, it "would find nothing improper in doing so," as it was "not required to ignore this history." Gerawan contends in its supplemental brief that because we rejected many of those findings and conclusions in *Gerawan II*, the factual basis and context the Board relied on in reaching its decision in this case is undermined. The Board, however, specifically stated: "[W]hile the record of Gerawan's bargaining conduct in this case fully supports our findings that it simply engaged in the surface motions of bargaining without any real intention of reaching agreement with the union, we consider such unlawful conduct as found in our prior decision as providing additional context to the parties' labor relations." The Board, however, clearly stated its "findings and affirmance of the ALJ's surface bargaining findings are based on the record in this case," and its "ultimate disposition of Gerawan's petition for review in the other case has no bearing on our disposition of this case." As the Board points out in its supplemental brief, neither the Board's preceding discussions on the surface bargaining question concerning the contract proposals at issue, nor Gerawan's delay in responding to the Union's information request, rely on any findings made on the Board's earlier decision in 42 ALRB No. 1.

a duty to bargain in good faith with the Union and could not "unilaterally declare" that it would "refuse to engage with the union" because it believed the Union had abandoned its employees (*Gerawan I*, *supra*, 3 Cal.5th at p. 1159). In its bargaining, Gerawan was permitted to stand firm on its positions if it reasonably believed them to be fair, but it could not merely go through the motions without any real intent to reach an agreement.

Here, the Board found Gerawan was going through the motions without any real intent of reaching an agreement based on its proposals and positions taken on the right to work, economic action, and union obligations proposals, as well as the Union's just cause provision, which centered only on its philosophical opinions of its employees' right to choose and failure to truly consider the Union's proposals. As we have explained, there is substantial evidence to support these findings. Our function is not to decide what inference we would draw from the facts presented, but rather whether reasonable minds could draw the one the Board did. (*Stonewall Cotton Mills*, *Inc. v. NLRB* (5th Cir. 1942) 129 F.2d 629, 631.) The Board's findings are neither "irrational," "tenuous," nor "unwarranted." (*Penasquitos Village*, *Inc. v. NLRB*, *supra*, 565 F.2d at p. 1079.) These findings are "supported by substantial evidence on the record considered as a whole, and will not be disturbed." (*Dal Porto*, *supra*, 163 Cal.App.3d at p. 553.)

### E.    Farm Labor Contractor Workers

The Board found that Gerawan violated section 1153, subdivision (e) by (1) refusing to bargain over the wages, hours and terms and conditions of employment of FLC workers, which is a per se violation of the duty to bargain, and (2) insisting on removing the FLC workers from the scope of any collective bargaining agreement.

Farm labor contractors are not employers under the Act; instead, the employer engaging the farm labor contractor is "deemed the employer for all purposes under [the Act]." (§ 1140.4, subd. (c); *Cardinal Distributing Co. v. Agricultural Labor Relations Bd.* (1984) 159 Cal.App.3d 758, 768.) FLC workers therefore are part of the bargaining unit represented by the Union and Gerawan is deemed their employer for purposes of

collective bargaining. (§§ 1140.4, subd. (c), 1156.2; *Bud Antle*, *Inc.* (2013) 39 ALRB No. 12, p. 9; *TMY Farms* (1976) 2 ALRB No. 58, pp. 4–5.) An employer's refusal to bargain over the wages, hours and other terms and conditions of employment of FLC workers constitutes a per se violation of the duty to bargain. (*Paul W. Bertuccio* (1984) 10 ALRB No. 16, ALJ Dec. pp. 21, 27, enfd. in relevant part *sub nom. Bertuccio v Agricultural Labor Relations Bd.* (1988) 202 Cal.App.3d 1369, 1377.)

A proposal to modify the scope of a bargaining unit or remove employees from it is not a mandatory subject of bargaining. (*Hess Oil & Chemical Corp. v. NLRB* (1969) 415 F.2d 440, 445 [holding "an issue concerning the construction of an appropriate unit so as to exclude certain members from that unit is not a subject for bargaining and an insistence upon it constitutes a violation" of the NLRA].) Likewise, an employer's insistence that bargaining be restricted to less than all employees in the bargaining unit constitutes a refusal to bargain. (*Paul W. Bertuccio*, *supra*, 10 ALRB No. 16, ALJ Dec. p. 20, citing *Beyerl Chevrolet*, *Inc.* (1975) 221 NLRB 710 [employer's "inclusion of language which arbitrarily limits the scope of the unit in any of its bargaining proposals shows a reluctance on its part to attempt to reach a collective-bargaining agreement" and constitutes bad faith bargaining].)

Gerawan's initial proposal was to exclude FLC workers from the terms of any agreement. Gerawan adhered to this proposal as written until its June 3, 2013 proposal.[26] While Gerawan agreed to include FLC workers under the grievance/arbitration provision, it continued to propose leaving all of the other terms and conditions of employment of

---

[26] Gerawan claims it dropped the proposal to wholly exclude FLC workers from the agreement by March 21, 2013. In making this statement, however, Gerawan cites to the Union's March 21, 2013 proposal. On March 19, 2013, Gerawan proposed adding a sentence to its original proposal excluding FLC workers, which stated it would "continue its past practice of making its best efforts" to employ direct-hire crews before FLC crews, but it would not guarantee direct-hire crew employees would be hired before or laid off after all FLC workers. The Union's March 21, 2013 response was to propose striking the exclusion of FLC workers and modify the added sentence to state only that Gerawan would use its best efforts to employ direct-hire crews before farm labor contractor crews.

62.

such workers for the farm labor contractors to determine.  At the hearing, Gerawan's counsel conceded the FLC workers were part of the bargaining unit, explaining that Gerawan's position was that it could treat them differently than other bargaining unit members.

The Board found Gerawan's proposals "effectively removed determinations concerning FLC workers' terms and conditions of employment from the scope of any contract."  Gerawan contends this is not a fair characterization of its position.  But that is precisely what Gerawan's proposals did—FLC workers' wages and benefits, as well as the discipline and discharge procedures applicable to them, would be set by the farm labor contractors rather than the contract.  The Board reasonably could find that by insisting the FLC workers remain outside the majority of the contract's terms, Gerawan in effect was refusing to bargain over the terms and conditions of employment, which is a per se violation of the duty to bargain.[27]

Gerawan contends the Board's reliance on *Paul R. Bertuccio*, *supra*, 10 ALRB No. 16 is misplaced, as there the grower refused to consider any proposals regarding FLC workers for three years and the Board expressly found the employer's position prevented the parties from reaching agreement.  Even so, the principle remains that an employer may not insist on excluding employees who are part of the bargaining unit or restrict

---

[27]    Gerawan contends the Board improperly considered positions it took after May 17, 2013, the date the original complaint was filed, which alleged conduct during bargaining sessions from January to April 2013.  Gerawan argues the Board exceeded the scope of the charged conduct, as the Board may not find an unfair labor practice based on conduct that was "not charged nor otherwise properly placed in issue" and where the employer "was not placed on notice it was required to defend against those charges."  (*George Arakelian Farms*, *Inc. v. Agricultural Labor Relations Bd.* (1986) 186 Cal.App.3d 94, 103.)  Gerawan, however, was placed on notice that the charged conduct extended past May 17, 2013, through allegations made in the third amended consolidated complaint filed on September 9, 2016.  There it was alleged that "[t]hroughout the negotiations with the UFW over a CBA, Gerawan proposed and insisted that the terms of any collective bargaining agreement would not apply to its FLC employees," and cited as evidence Gerawan's June 3, 2013 proposal, and 11 bargaining sessions in which Gerawan never offered a proposal to extend the contract to FLC employees.

bargaining to less than all members of the unit. (*Beyerl Chevrolet*, *Inc.*, *supra*, 221 NLRB at p. 720.) Gerawan asserts it never refused to bargain over the FLC workers, but as we have discussed, the Board reasonably found that it effectively did.[28]

Finally, Gerawan contends the Board ignored the mediator's findings regarding farm labor contractor issues. In setting out the parties' positions, the mediator noted the Union sought to preserve the work of direct-hire employees by prohibiting the use of farm labor contractors when it would cause a lay-off of direct hires, and to bind the contractor to the wages, and terms and conditions of employment, applicable to direct hires under the agreement. Gerawan asserts the Union therefore proposed preferential treatment of one group of employees over another in violation of its duty of fair representation. Gerawan further asserts even the mediator noted other collective bargaining agreements "reveal that agricultural employers apply a wide range of exceptions to the CBA's provisions when applied to FLC workers." From this, Gerawan claims there is nothing that "prevents giving preferential treatment to hiring/recalling direct-hires outside of a contract."

The mediator, however, also noted that farm labor contractors' exclusions are commonly found in the subcontracting clause, and even contracts Gerawan cited contained limitations on the use of subcontractors, namely, that they will not be used to the detriment of direct hires, must have skills or equipment the bargaining unit employees do not, or are needed for demands dictated by time and weather. The mediator then found the wages, hours and other terms and conditions of employment of the collective

---

[28]    Gerawan claims its later proposals were closer to the Union's proposal than its original one, citing to a statement in the Union's negotiator's February 13, 2013 notes that "FLC language is a lot closer." It is apparent from the note, however, that this statement was made by a Gerawan negotiation team member, "MM," in response to a review of the Union's February 12, 2013 proposal, in which the Union proposed to amend the first section of its original proposal to provide that Gerawan would "make best efforts" to use direct-hire employees. Gerawan did not propose any changes to the farm labor contractor proposal in its February 12, 2013 proposal.

bargaining agreement should apply to FLC workers, as they are deemed employees of Gerawan, and because they have the right to sign certification or decertification petitions and vote in representation elections, they have an impact on whether they, as well as direct-hire employees, are represented when engaged at an employer's operations.

The mediator in fact found that it was reasonable for the Union to give preference to direct hires over FLC workers with respect to hiring and layoffs, but when FLC workers were used, their wages, hours and terms and conditions of employment must be equivalent to those given direct-hire employees under the contract. Thus, the mediator's findings actually support the Board's conclusion that Gerawan's insistence on removing the FLC workers from the scope of any collective bargaining agreement, and its persistent refusal to bargain over their wages and terms and conditions of employment, constituted a refusal to bargain in good faith in violation of section 1153, subdivision (e).

## F.     *Separation of Powers*

After the Board adopted the mediator's report setting the terms of the MMC contract, Gerawan petitioned this court for review of that order, raising constitutional challenges to the MMC statute, which encompassed some of the terms that were part of the Board's bad faith finding in this case. During the pendency of that proceeding, the hearing on the unfair labor practice charges at issue here was held, the ALJ issued his decision, and the Board addressed the parties' exceptions and issued its order affirming the ALJ's factual findings and legal conclusions, which Gerawan petitioned this court to review. After briefing was completed in this case, we dismissed Gerawan's petition from the Board's order adopting the MMC contract as moot in light of the Union's decertification.

In Gerawan's opening and reply briefs, Gerawan pointed out the Board's bad faith bargaining finding was based on terms the mediator imposed as part of the MMC contract, notwithstanding the fact this court had yet to decide whether these (and other) terms of the contract were arbitrary, unconstitutional or imposed unlawfully in Gerawan's

petition from the Board's order adopting the MMC contract. Gerawan argued this usurped this court's exclusive jurisdiction to decide whether the disputed contract terms were lawful before the Board passed judgment on Gerawan's bargaining positions on those terms. Gerawan asserted the Board assumed the MMC contract was valid, notwithstanding the fact the decertification election took place before the contract was imposed.

The Board argued in its brief that the then pending judicial review of the Board's earlier decision had "no impact" on its ability to examine whether Gerawan engaged in bad faith bargaining in the negotiations that preceded that order. The Board explained that this case concerns Gerawan's bargaining conduct leading up to August 2013, four months before the Board's order adopting the MMC contract, when Gerawan's violation of the Act was complete. The Board asserts the fact that later events produced a contract does not retroactively convert Gerawan's unlawful conduct into lawful conduct or preclude the Board from remedying the effects of the violation.

In supplemental briefing on the effect of the Union's decertification on the parties' arguments, Gerawan contends the election's nullification of the MMC contract not only calls into question the validity of the contracting process imposed on Gerawan and its workers, but also undermines the Board's holding that Gerawan's objections to terms the mediator imposed, which are now void, were improper.

The Board responds in its supplemental brief that this case is not about MMC or the contract eventually ordered into effect at the conclusion of MMC, but rather Gerawan's conduct both before MMC and outside the mediator's presence after the parties were ordered to MMC. The Board argues the disposition of the earlier MMC litigation has no bearing on Gerawan's bad faith conduct during its negotiations with the Union outside the context of MMC, noting Gerawan concedes its good faith bargaining obligation continued until the Union was decertified.

We agree with the Board that the earlier case has no bearing on this one. In this case, the Board was judging conduct leading up to the formal MMC proceedings that concluded before any MMC contract was adopted. The primary issue before the Board was whether Gerawan engaged in good faith bargaining by entering into negotiations with an intent to reach an agreement. The examination of this issue does not call into question the validity or legality of the terms the mediator ultimately adopted. Rather, it requires an analysis of Gerawan's state of mind, as shown by its conduct at and away from the bargaining table.

## IV.    The Make-Whole Remedy

"The ALRA authorizes the Board to grant certain remedies, including make-whole relief, when it determines that a party has engaged in unfair labor practices. (§ 1160.3.) 'Make-whole relief is a compensatory remedy that reimburses employees for the losses they incur as a result of delays in the collective bargaining process. [Citation.] The remedy is designed to give agricultural employees the type of economic benefits they would have received if the parties had reached a timely agreement.' " (*Tri-Fanucchi Farms v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1161, 1167–1168, citing *George Arakelian Farms*, *Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1286, fn. 3.)[29]

The ALRB has broad discretion in applying this remedial make-whole power. (*Holtville Farms*, *Inc. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 388, 390.) " 'Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the [ALRB's] discretion and

---

[29]    Section 1160.3 provides that the Board shall issue an order "requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, *and making employees whole, when the board deems such relief appropriate*, for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part." (§ 1160.3, italics added.)

must guard against the dangers of sliding unconsciously from the narrow confines of law into the more spacious domains of policy.' " (*Carian v. Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 674.) Accordingly, the ALRB's remedial order should not be disturbed " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.' " (*Ibid.*)

The Board concluded the make-whole remedy was appropriate under the circumstance presented in this case. In considering make-whole relief, the ALJ and the Board applied the test stated in *William Dal Porto & Sons*, *Inc. v. Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195. Under that test, once the Board produces evidence showing the employer unlawfully refused to bargain, a presumption is created that the parties would have consummated a collective bargaining agreement providing for higher employee pay had the employer bargained in good faith. (*Id.* at pp. 1208–1209.) The burden of persuasion then shifts to the employer to rebut the presumption and if the employer cannot do so, "the Board is entitled to find an agreement providing for higher pay would have been concluded." (*Ibid.*) To rebut the presumption, the employer must produce "evidence of some alternative, legitimate cause for the parties' failure to agree" that shows "the parties would not have agreed even if the employer had *not* refused to bargain." (*United Farm Workers v. Agricultural Labor Relations Bd.* (1993) 16 Cal.App.4th 1629, 1640.)

Applying this test, the Board explained that since it found Gerawan unlawfully engaged in surface bargaining in violation of the Act, it presumed an agreement providing for higher employer wages would have been reached in the absence of Gerawan's unlawful conduct. The Board affirmed the ALJ's conclusion that Gerawan failed to meet its burden to show a contract providing for higher wages would not have been reached had Gerawan bargained in good faith.

The Board also found make-whole relief was appropriate under the *F & P Growers* standard, in which the Board "consider[s] on a case-by-case basis the extent to

which the public interest in the employer's position weighs against the harm done to the employees by its refusal to bargain. Unless litigation of the employer's position furthers the policies and purposes of the act, the employer, not the employees, should ultimately bear the financial risk of its choice to litigate rather than bargain." (*F & P Growers Assn. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667, 682.) The Board found Gerawan's conduct did not further the policies and purposes of the Act, as its decision to engage in a " 'time-consuming bargaining charade,' part of which 'included an unrelenting effort to discredit' its employees' representative" was inimical to the purposes of the Act, and "was destructive of the core right of employees 'to negotiate the terms and conditions of their employment' through their bargaining representative."

The Board rejected Gerawan's argument that a make-whole award was not appropriate when MMC has been invoked. The Board noted there was nothing in the MMC statute that precluded a make-whole award for an unfair labor practice violation. Moreover, the mediator's authority in the MMC process was limited to resolving the final terms of a collective bargaining agreement regarding the mandatory subjects of bargaining; the mediator did not have authority under the MMC process to order unfair labor practice remedies. Finally, the parties continued to bargain without the mediator's assistance after MMC was invoked.

Gerawan does not challenge the Board's application of the *Dal Porto* test and its decision to impose the make-whole remedy based on Gerawan's conduct. Instead, Gerawan challenges the Board's authority to award make-whole relief when a party is engaged in MMC. Gerawan contends the Board does not have the statutory authority to impose make-whole relief and make-whole remedies violate its due process rights.

As we explained in discussing a party's good faith bargaining duty, section 1160 empowers the Board to adjudicate unfair labor practice charges that arise from negotiations outside the mediator's presence during the MMC process. This necessarily includes the power, should the Board find that a party has engaged in an unfair labor

practice, to, among other things, make employees whole "for the loss of pay resulting from the employer's refusal to bargain." (§ 1160.3.)

Gerawan argues there can be no refusal to bargain once the parties enter MMC because MMC will result in the imposition of a contract whether or not the employer participates. While this may be true if we were examining an employer's conduct during MMC proceedings before the mediator, here we are addressing an employer's conduct in bargaining sessions held outside the mediator's presence. Given that the parties have a duty to bargain in good faith during those sessions, an employer in fact may be found to have refused to bargain in those sessions despite the mediator's ultimate ability to establish the final terms of a collective bargaining agreement. Contrary to Gerawan's contention, the Board did not "vest itself with power beyond authority under its enabling statute, or invent a new remedy out of whole cloth" when it found the make-whole remedy was appropriate, as it was authorized to impose such a remedy under section 1160.3.

Gerawan asserts "[t]he Board does not explain why it may second-guess the mediator's decision *not* to sanction Gerawan for what it deems unlawful conduct, let alone why it may pile on top of retroactive wage increases already imposed by the mediator." As we have explained, the purpose of the MMC statute is to facilitate the negotiation and completion of collective bargaining agreements, with the parties retaining the right to reach voluntary agreement on disputed issues. (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1130; *Gerawan Farming III*, *supra*, 40 Cal.App.5th at p. 271.) The mediator's authority in the MMC process is limited to resolving the final terms of a collective bargaining agreement. The MMC statute "does not give a mediator the authority to find unfair labor practices, or to remedy them." (*Arnaudo Brothers* (2015) 41 ALRB No. 6, ALJ Dec. p. 13, enfd. *sub nom. Arnaudo Brothers*, *supra*, 22 Cal.App.5th 1213.) The authority to order unfair labor practice remedies remains exclusively with the Board. (§§ 1160.3, 1160.9.)

Gerawan complains that imposing unfair labor practice liability "on top of the contract terms fixed by the mediator (or the sanctions he may impose) creates a serious risk of contradictory and double punishment." Gerawan asserts that if the Board has the power to adjudicate unfair labor practice charges within MMC, the Board could punish as an unfair labor practice a party's failure to comply with its discovery obligations, even if the mediator chose not to do so,[30] or an employer who declines to participate in MMC may be subject to both a contract based solely on the Union's proposals and monetary sanctions for failure to bargain.[31] The distinction here, however, is that the Board did not punish Gerawan's conduct in the MMC process, but rather its conduct during negotiations held outside the mediator's presence. Our conclusions in this case are limited to that situation.

Gerawan contends its due process rights were violated because the Board imposed a new policy, not found in the MMC statute, that an employer is required to bargain in good faith during MMC, and retroactively fined it for failing to comply with that policy.

Generally, an agency "is not precluded from announcing new principles in an adjudicative proceeding and … the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." (*NLRB v. Bell Aerospace Co.* (1974) 416 U.S. 267, 294.) In a "narrow class of cases," however, an agency may abuse its

---

[30] The parties have the ability to conduct discovery in MMC and the mediator is empowered to "draw adverse inferences or impose terms, conditions, or sanctions" for the purpose of enforcing the duty to make discovery. (Cal. Code Regs., § 20406, subd. (d).)

[31] Gerawan contends this is especially egregious since the Board's regulations contemplate that a party may refuse to participate in the MMC process without threat of sanctions. The regulations provide that "[t]he failure of any party to participate or cooperate in the mediation and conciliation process shall not prevent the mediator from filing a report with the Board that resolves all issues and establishes the final terms of a collective bargaining agreement, based on the presentation of the other party." (Cal. Code Regs., § 20407, subd. (a)(1).) While the mediator may impose a contract if a party refuses to participate or cooperate, the regulations are silent on whether that party may also be subject to unfair practice liability.

71.

discretion by announcing new rules through adjudication rather than through rulemaking, such as where the new rule "departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application." (*Pfaff v. U.S. Dept. of Housing* (9th Cir. 1996) 88 F.3d 739, 748.)

Gerawan asserts this case fits within this narrow class of cases because as a result of the Board's new policy of requiring good faith bargaining during MMC, the Board retroactively fined Gerawan for failing to comply with that policy. However, as we have explained, the Board did not make policy "in contradiction to its own regulations and the role assigned to it under the [MMC] statute," as Gerawan contends. Instead, the Board was acting within the authority granted it by section 1160 and its decision did not conflict with the MMC statute or its implementing regulations. As such, no due process violation has been shown.

In its supplemental brief, Gerawan asserts its bargaining conduct was based on a genuine and reasonable belief the contract terms at issue were both unconstitutional and at odds with the wishes of its workers. Gerawan argues this belief bears on the legitimacy of the make-whole remedies the Board would impose, citing *Nish Noroian Farms*, *supra*, 8 ALRB No. 25, pages 14–15, in which the Board stated it determines whether make-whole relief is warranted for a refusal to bargain while the results of a decertification election are pending "based on such factors as whether the employer withdrew recognition and refused to bargain because of an honestly-held and reasonable good-faith belief that the Board would ultimately certify that the incumbent lost the election."

During the bargaining conduct at issue in this case, however, a decertification election had not been held. Thus, the Union remained the employees' certified bargaining representative and Gerawan could not raise " 'a good faith doubt of majority

72.

support' " defense to its refusal to bargain. (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1154, citing *F & P Growers Assn. v. Agricultural Labor Relations Bd.*, *supra*, 168 Cal.App.3d at p. 678; see *Nish Noroian Farms*, *supra*, 8 ALRB No. 25.) Neither could it refuse to bargain with the Union "on the ground that it has 'abandoned' its status as representative." (*Gerawan Farming I*, at p. 1155, citing *Dole Fresh Fruit Company* (1996) 22 ALRB No. 4, *Bruce Church*, *Inc.* (1991) 17 ALRB No. 1 & *Lu-Ette Farms*, *Inc.* (1982) 8 ALRB No. 91.)

As our Supreme Court explained in *Gerawan Farming I* when rejecting Gerawan's assertion that the abandonment defense was " 'the only way to protect the workers' right to choose' ": "[T]he ALRA contains a comprehensive set of protections for employees who no longer wish to be represented by the certified labor union," such as petitioning for a new election, and the employer has "multiple options to defend against 'what may appear to be a derelict or defunct incumbent union.' [Citation.] What an employer cannot do under the ALRA is unilaterally declare that it will refuse to engage with the union because it believes the union has abandoned its employees. This is true whether in response to an initial demand to bargain, a renewed demand to bargain, or a request to refer the parties to MMC. In all cases, the ALRA reserves the power to select the union representative to the employees and labor organizations alone." (*Gerawan Farming I*, *supra*, 3 Cal.5th at pp. 1158–1159.)

Similarly, here, Gerawan may not refuse to bargain with its employees' certified bargaining representative based on its belief that it represents the employees' interests better than the Union. To hold otherwise would permit Gerawan to " 'do indirectly … what the Legislature has clearly shown it does not intend the employer to do directly,' " namely, " 'to limit the employer's influence in determining whether or not it shall bargain with a particular union … [and] remove the employer from any peripheral participation.' " (*Gerawan Farming I*, *supra*, 3 Cal.5th at p. 1158.)

**V.      Gerawan's Motion to Disqualify Board Member Hall**

Gerawan brought a prehearing motion to disqualify Board member Isadore Hall III from participating in the Board's decision in this case, which the Board denied.  The Board also denied Gerawan's motion for reconsideration.  In its petition, Gerawan contends the undisputed evidence demonstrated Hall's animus toward it and created the appearance of partiality; therefore, his participation in this case requires us to vacate the Board's decision and set aside its order.  Gerawan also contends Hall's participation in the decision on the disqualification motion is an independent basis to vacate the Board's order.[32]

### A.      Gerawan's Motions

In April 2017, Gerawan moved to disqualify Hall from participating in the exceptions process relating to the ALJ's decision.  Gerawan contended Hall's previous actions and statements demonstrated bias and lack of impartiality as to the specific facts in this dispute.  Specifically, Gerawan alleged that on October 22, 2014, when Hall was a California State Assemblyman, he participated in a Los Angeles labor rally in support of a UFW-sponsored resolution before the Los Angeles City Council, which concerned some of the same unfair labor practice charges involved in this case.  Based on this,

---

[32]      While Gerawan briefed these issues in the memorandum of points and authorities attached to its petition for writ of review, it did not discuss this issue in its opening brief other than to note that it would not "repeat its discussion of the disabling conflicts of Member Hall," citing to its argument in the petition.  The Board contends by not repeating the argument in its opening brief, Gerawan forfeited the issue.  (See, e.g., *Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1201 [appellant forfeited claim where its briefing did not provide reasoned response to an issue respondent raised]; *Parker v. Wolters Kluwer U.S., Inc.* (2007) 149 Cal.App.4th 285, 290 [appellate court may disregard arguments made to the trial court that are incorporated by reference into appellate brief, as this practice does not comply with California Rules of Court, rule 8.204(a)(1)(B)].)  As Gerawan points out in its reply brief, these cases do not apply here, where a petitioner set forth its argument in its petition for review.  In any event, we exercise our discretion to decide the issue, as the Board and Union were aware of argument and the grounds for it.

Gerawan argued a disinterested observer would conclude Hall had "in some measure adjudged the facts as well as the law in this case in advance of hearing it," and therefore he must be disqualified from participating in the decision-making process in this matter. With Hall disqualified, Gerawan argued the Board could not adjudicate the ALJ's decision because it lacked a valid quorum until the Governor filled at least one vacancy on the Board.

In support of the motion, Gerawan submitted a number of photographs, several Facebook posts, the resolution, and a March 2017 letter from California Senator Andy Vidak to California Senate President pro tempore Kevin de León. Several photographs were from the UFW's and Councilman Herb Wesson's Facebook pages showing then-Assemblyman Hall marching with supporters of the resolution. An October 29, 2014 statement posted on Hall's Facebook page concerned the announcement that Maria Elena Durazo was leaving her position as executive secretary of the Los Angeles County Federation of Labor to become vice president for immigration, civil rights and diversity at UNITE HERE International. Hall stated he listened to Durazo "speak at Prima Farm Workers' march to L.A. City Hall" and was inspired by her story. He further stated this was not "the first time Maria Elena and I have teamed up for Los Angeles County workers," and he was proud to call her his friend and ally "in the continued fight to empower California's working people."

Two documents were posts from Hall's Facebook page: (1) an October 24, 2014 announcement that Hall received an endorsement from John Burton in support of Hall's California State Senate bid, which listed over 40 other endorsements by individuals and organizations, including the UFW; and (2) an October 26, 2015 announcement that the UFW was endorsing Hall in his 2016 campaign for California's 44th Congressional District seat.

The resolution, which was approved by the Los Angeles City Council on October 22, 2014, and the mayor on October 28, 2014, listed seven recitations concerning

75.

Gerawan and its refusal to implement the MMC contract. The resolution called on Gerawan to meet "basic standards of conduct, including refraining from violating state or federal laws such as labor relations laws, anti-discrimination laws, and minimum wage and hour laws," and "strongly urge[d] that Gerawan immediately implement the union contract issued by the neutral mediator and the state of California." One of the seven recitations stated the Board's general counsel "had filed four complaints—tantamount to indictments—accusing the Gerawans" of 'illegally excluding some of its farm workers from the benefits of a [union contract]'; illegally 'instigating and encouraging the gathering of signatures' on petitions to decertify the UFW; 'unlawfully interrogating workers about their union activities' and 'surveil[l]ing' workers; 'failing to bargain in good faith with its employees' union'; and failing to implement the state-issued union contract."

Finally, in Vidak's March 13, 2017 letter, Vidak asked de León to postpone the Senate floor vote on the confirmation of Hall until an investigation could be conducted regarding an incident that allegedly occurred at a hotel on February 28, 2017. Vidak stated "several witnesses" told him Hall "threatened to use his position to 'get' several farmers who oppose his confirmation."

Both the ALRB's general counsel and the UFW filed oppositions to the motion. They argued the documentary evidence Gerawan submitted did not establish actual bias or prejudice requiring Hall's disqualification. The general counsel contended to disqualify Hall, Gerawan must present evidence showing he prejudged the facts and law as to Gerawan's bargaining behavior between January and August 2013, and Hall's presence at the labor rally about the MMC contract and the resolution did not satisfy that burden of proof.

Gerawan filed a reply reiterating its argument that Hall should be disqualified because he publicly aligned himself with the UFW and against Gerawan at the rally, revealing both an actual bias and an unacceptable probability of actual bias in

76.

adjudicating this case. Gerawan submitted an anonymous declaration, dated May 8, 2017, regarding the February 28, 2017 incident reported in Vidak's letter. The declarant, a safety coordinator for a California company who was in Sacramento to attend a meeting of the Fresh Fruit Association, described a conversation he had with Hall at a Sacramento hotel that day. The declarant stated Hall asked him who Gerawan was and the declarant answered it was a farming company in the Central Valley whose employees had been trying to get their ballots counted to decertify the UFW, and Hall went on to say they "made a video about me, and I am going to get their ass."

Gerawan asserted the declarant requested anonymity based on his fear that the ALRB, general counsel, or UFW would target either he or his employer for coming forward with this evidence. Gerawan argued the declaration revealed actual bias and Hall's intent to use his position to retaliate against Gerawan and its employees, and if Hall would not recuse himself, he should be called to provide testimony.

The Board denied the motion, with Hall participating in the decision. The Board found Gerawan's evidence concerning the rally and resolution did not establish either actual bias or an unacceptable risk of bias on Hall's part, as the evidence did not show Hall made any statements concerning the resolution, signed the resolution, or was in attendance when the resolution was presented to the City Council. The Board concluded Hall's limited participation as a state legislator in the October 22, 2014 events did not prevent him from reaching an unbiased conclusion in this case. The Board did not consider the anonymous declaration for the following reasons: (1) the statute Gerawan relied on for withholding the declarant's identity, Evidence Code section 1041, which applies to a public entity's privilege to refuse to disclose the identity of a confidential informant, did not apply; (2) Gerawan did not explain why the declaration was not provided with its initial motion; and (3) the declaration was inadmissible hearsay and not supported by corroborating evidence or any other indicia of reliability.

The Board rejected Gerawan's argument that Hall was barred from participating in the Board's deliberations or decision on the motion, as the statute Gerawan relied on, Government Code section 11512, subdivision (c), does not apply to the Board and under ALRB and NLRB precedent, Board members and administrative law judges may hear and rule on disqualification motions filed against them.

Gerawan filed a motion for reconsideration of the Board's decision. Gerawan argued the Board committed clear error by excluding the confidential witnesses' testimony and submitted an unredacted declaration that revealed the witness' identity. Gerawan's attorney explained in his declaration that The Specialty Crop Company (Specialty) contacted Gerawan on or about May 5, 2017, and said its employee, Shaun Ramirez, had information relevant to Hall. Three days later, Specialty agreed to provide Ramirez's declaration to Gerawan pursuant to a memorandum of understanding that required Gerawan to redact all identifying information because Specialty was concerned about possible retaliation. After the Board denied Gerawan's motion, Specialty gave its written consent to file an unredacted version of the declaration, which revealed Ramirez's identity but otherwise was identical to the anonymous one.

Gerawan argued Ramirez's identity was an intervening change in law or evidence that required reconsideration of the Board's decision, and the disclosure of the declarant's identity removed any basis to disregard the declaration. Gerawan further argued the declaration was not inadmissible hearsay, and the Board erred by disregarding the declaration because it was offered with the reply.

The Board denied the motion for reconsideration because Gerawan failed to show extraordinary circumstances warranted reconsideration. The Board found the declarant's identity did not constitute previously unavailable or newly discovered evidence required to grant reconsideration, as Gerawan was aware of the declarant's identity before it filed its reply brief and his identity was available to Gerawan. The Board further found Gerawan's explanation for not disclosing the declarant's identity earlier did not satisfy

the standard for reconsideration and Gerawan's attorney's statements in his declaration were not based on the attorney's personal knowledge.

Hall wrote a concurrence, in which he assured Gerawan, as well as other parties who may come before the Board, "that I can and will, in the words of the oath I took upon assuming this position, 'faithfully discharge the duties' of a Board Member" of the ALRB. Hall listed the elected offices he held over the past 17 years, as well as his master's and doctoral degrees, and stated in all his years of public service, he had made, and would continue to make, unbiased and fair decisions. Hall explained that after his appointment to the Board on January 13, 2017, he became aware there were "unwarranted attacks, including videos, being made against me on social media," but he did not attribute any of these videos to Gerawan and to his knowledge, Gerawan was not responsible for them.

While the declarant stated Hall asked him who Gerawan was on the eve of his March 1, 2017 confirmation hearing, Hall was familiar with Gerawan at the time. On January 27, 2017, Hall received a letter from de León concerning the confirmation process, which requested responses to various questions, including several pertaining to Gerawan, which he provided on February 10, 2017. Hall stated he harbored no bias or hostility toward Gerawan and would consider only the record before the Board, and applicable legal precedent, in his deliberations in this case, as well as all other cases that came before the Board. For these reasons, Hall rejected the claims of bias leveled against him and declined to recuse himself from participation in the deliberations in this case.

**B.      *Due Process Right to a Fair Tribunal***

"When, as here, an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal. [Citation.] A fair tribunal is one in which the judge or other decision maker is free of bias for or against a party." (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737 (*Morongo Band*).) While the requirements of due process extend to

79.

administrative adjudications, "[t]he standard of impartiality required at an administrative hearing is less exacting than that required in a judicial proceeding." (*Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219–220); *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 214 (*Today's Fresh Start*).)

Adjudicators are presumed to be impartial unless they have a financial interest in the outcome. (*Morongo Band*, *supra*, 45 Cal.4th at p. 737.) "To show nonfinancial bias sufficient to violate due process, a party must demonstrate actual bias or circumstances ' "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." ' " (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 219, citing *Morongo Band*, at p. 737.) "The test is an objective one," and while the " 'degree or kind of interest . . . sufficient to disqualify a judge from sitting "cannot be defined with precision" ' [citation], due process violations generally are confined to 'the exceptional case presenting extreme facts.' " (*Today's Fresh Start*, at p. 219.)

The presumption of impartiality may "be overcome only by specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias." (*Morongo Band*, *supra*, 45 Cal.4th at p. 741.) The mere appearance of bias, however, is not a ground for the disqualification of a judicial officer. (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 791.)[33] To disqualify a judicial officer, the moving party must offer legally sufficient facts to demonstrate the judicial officer's bias, which must be " 'against a particular party [citations] *and* sufficient to impair the judge's impartiality so that it appears probable that a fair trial cannot be held.' " (*Id.* at p. 792.) If that burden is satisfied, "the challenged judicial officer or a reviewing court must still decide whether such bias will render it

---

[33] A judicial officer may be disqualified based on an appearance of bias where "the judicial officer either has a personal or financial interest, has a familial relation to a party or attorney, or has been counsel to a party." (*Gai v. City of Selma*, *supra*, 68 Cal.App.4th at pp. 221–222.)

probable that a fair trial cannot be held before that judge.  In other words, the bias or prejudice must be 'sufficient to impair the judge's impartiality.' " (*Ibid.*)

"A mere suggestion of bias is not sufficient to overcome the presumption of integrity and honesty." (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1236.)  Bias may be shown by "a commitment to a result (albeit, perhaps, even a tentative commitment)" (*ibid.*), or "through evidence that the adjudicator 'had it "in" for the party for reasons unrelated to the officer's view of the law' " (*Stivers v. Pierce* (9th Cir. 1995) 71 F.3d 732, 744).  A decisionmaker is not "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.' " (*Hortonville Joint School Dist. v. Hortonville Education Assn.* (1976) 426 U.S. 482, 493.)  However, bias or prejudice against a party may be shown when a judge gratuitously offers an opinion on a matter not yet pending before him or her.  (*Pacific etc. Conference of United Methodist Church v. Superior Court* (1978) 82 Cal.App.3d 72, 87.)

### C.     *Gerawan's Evidence Does Not Establish Bias*

We consider whether Gerawan presented specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias on Hall's part.

The evidence presented with Gerawan's original motion showed that Hall marched in a rally with supporters of a city council resolution that urged Gerawan to implement the MMC contract while he was a sitting state legislator campaigning for state senate.  There was no evidence then-Assemblyman Hall made any statement concerning the resolution, signed the resolution or was in attendance when the resolution was presented to the Los Angeles City Council.  The only statement Hall made relative to the rally and resolution was specific to Maria Elena Durazo, congratulating her on her new job and praising her as a "true hero for working people" based on her accomplishments and

81.

background. While Hall stated he listened to, and was inspired by, Durazo's speech at the "Prima Farm Workers' march to L.A. City Hall," the primary message of the statement was one of praise for, and congratulations on, her career and new position. Hall did not make any statement concerning the resolution of any matter that was pending before the Board.

The resolution itself did not contain any statements concerning the merits of the issues that were before the Board in the current case. Although it stated the fact that the general counsel had issued complaints containing various allegations against Gerawan, including " 'illegally excluding some of its farm workers from the benefits of a [union contract]' and 'failing to bargain in good faith with its employees' union,' " the resolution did not contain any statement as to the merits of these allegations. Rather, it exhorted Gerawan generally to "meet[] basic standards of conduct, including refraining from violating state or federal laws" and urged Gerawan to implement the MMC contract. Thus, in addition to the fact there was no evidence Hall made a statement concerning the resolution, the resolution itself does not contain any statement concerning the matters before the Board, apart from the bare fact that complaints had been issued.

At best, the evidence shows Hall has past, supportive associations with labor groups when he was a state legislator, and that he was present for some portion of the events that preceded the presentation of the resolution to the city council. This does not satisfy Gerawan's burden of showing actual bias or circumstances creating an unacceptable risk of bias. (*People v. Vasquez* (2006) 39 Cal.4th 47, 63–64 [personal connections and relationships generally do not require recusal]; *United States v. Black* (E.D.N.C. 2007) 490 F.Supp.2d 630, 661 ["a judge's prior membership in or affiliation with a politically related organization does not, by itself, provide a reasonable basis for questioning a judge's impartiality in cases in which that organization is a party"]; *Bud Antle*, *Inc.* (1976) 2 ALRB No. 35, p. 4 [courts generally accept and condone an agency

member's involvement with an industry unless it involves the member's pecuniary interest].)

Contrary to Gerawan's assertion, Hall did not make public statements that were indicative of prejudgment of this case. For this reason, the cases Gerawan relies on are distinguishable. In *Berkshire Employees Ass'n of Berkshire Knitting Mills v. NLRB* (3d Cir. 1941) 121 F.2d 235, a sitting board member wrote a customer of Berkshire about an ongoing strike at Berkshire's mill and enclosed a union letter asking for cooperation from Berkshire's customers, which the court interpreted as encouraging a boycott on Berkshire's goods. (*Id.* at p. 238.) The court found the correspondence went "far beyond a general predilection either for or against labor organizations in general or one organization in particular," and, if proven, showed the member "had already thrown his weight on the other side." (*Id.* at pp. 238–239)

In *Antoniu v. SEC* (8th Cir. 1989) 877 F.2d 721, while Antoniu's request for a broker-dealer license was pending before the Securities and Exchange Commission, a commissioner gave a speech that outlined two recent cases in which the commission imposed sanctions, referred to the sanctioned entities as " 'indifferent violator[s],' " and went on to say that in Antoniu's case, " 'his bar from association with a broker-dealer was made permanent.' " (*Id.* at p. 723, italics omitted.) The court found this last statement could "only be interpreted as a prejudgment of the issue," and it could "come to no conclusion other than that [the commissioner] had 'in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' " (*Id.* at pp. 723, 726.)

Gerawan asserts Hall's purported statement to Ramirez that " 'I am going to get their ass' " evidenced Hall's "willingness to use his position to 'get' those who, like Gerawan, exercised the same right to petition the government as he exercised on the steps

of City Hall."[34]  The Board, however, declined to consider the anonymous declaration containing this statement on Gerawan's original motion based in part on its anonymity. Gerawan does not argue the Board erred in this regard and presumes this evidence was properly before the Board.  While Gerawan attempted to rectify the problem on its motion for reconsideration by filing a declaration that disclosed the declarant's identity, the Board denied the motion because Gerawan failed to satisfy its standard for granting reconsideration, namely, showing "*extraordinary circumstances*, i.e., an intervening change in the law or evidence previously unavailable or newly discovered."  (*South Lakes Dairy Farms* (2013) 39 ALRB No. 2, p. 2.)  Gerawan does not argue the Board erred in its decision, other than to say "[i]gnoring evidence does not resolve the issue of Hall's bias."  Gerawan has forfeited the issue by failing to present legal authorities or reasoned argument on this point.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Since Gerawan has not shown that Hall had an actual bias or there was an unacceptable risk of bias, the Board did not err when it denied Gerawan's disqualification motion.

### D.      *Hall's Participation in the Motions*

Gerawan contends Government Code section 11512, subdivision (c),[35] which requires a request to disqualify an agency member be heard by the other agency members, prohibited Hall from participating in the Board's deliberations or decisions on the motions for disqualification and reconsideration.  This section, however, does not apply to the Board as a matter of law.

---

[34]      Gerawan incorrectly asserts Hall was a Board member when he made statements to Ramirez.  At the time, Hall had been appointed, but he had not yet been confirmed.

[35]      Government Code section 11512, subdivision (c) allows a party to request disqualification of any administrative law judge or agency member before evidence is taken at a hearing, and "[w]here the request concerns an agency member, the issue shall be determined by the other members of the agency."

84.

The administrative adjudication provisions of the Administrative Procedure Act are set forth in two chapters contained in part 1 of division 3 of title 2 of the Government Code: Chapter 4.5 (commencing with Government Code section 11400) and chapter 5 (commencing with Government Code section 11500). (Gov. Code, § 11400, subd. (a).) The ALRA adopts the provisions of "Chapter 4.5 (commencing with Section 11400) of Part 1 of Division 3 of Title 2 of the Government Code" for purposes of "a hearing to determine an unfair labor practice charge." (§ 1144.5, subd. (a).) The ALRA, however, does not state the provisions of chapter 5, which includes section 11512, apply to ALRB proceedings; therefore, that chapter does not apply to the ALRB. (Gov. Code, § 11501, subd. (a) ["This chapter applies to any agency as determined by the statutes relating to that agency."].) As the Law Revision Commission Comments following Labor Code section 1144.5 explain: "Although Section 1144.5 is silent on the question, the formal hearing provisions of the Administrative Procedure Act (Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code) do not apply to proceedings of the Agricultural Labor Relations Board under this part." (Cal. Law Revision Com. com., West's Ann. Lab. Code (2011) foll. Lab. Code, § 1144.5, citing Gov. Code, § 11501.)

Gerawan's contention that Hall may not participate in deliberations or issuance of rulings on its motions also lacks support in ALRB and NLRB precedent, where Board members and administrative law judges hear and rule on disqualification motions filed against them. (See *Gerawan Farming, Inc.*, *supra,* 42 ALRB No. 1, p. 3, fn.2; *Triple E Produce Corp.* (1997) 23 ALRB No. 8, p. 13; *California Coastal Farms, Inc. v. Doctoroff* (1981) 117 Cal.App.3d 156, 158–159; *Service Employees Int'l Union, Nurses Alliance, Local 121RN* (*Pomona Valley Hosp.*) (2010) 355 NLRB 234, 235; *Emeryville Trucking, Inc.* (1986) 278 NLRB 1112, fn. 1; *Cedars-Sinai Medical Center* (1976) 224 NLRB 626; *West India Fruit & Steamship Co., Inc.* (1961) 130 NLRB 343, 345, fn. 6.; but see *Bud Antle, Inc.*, *supra*, 2 ALRB No. 35, p. 7 [noting that a Board member who

85.

was the subject of a disqualification motion did not participate in the decision on the motion].)

Since Hall was not required to recuse himself from ruling on Gerawan's motions, we do not decide whether his participation was compelled by the rule of necessity. Had Hall recused himself, there would be open questions as to whether the remaining two Board members could act or wait until the Governor made at least one appointment to the vacancies to act. The Board had the authority to act on the motions with Hall's participation.

## DISPOSITION

The petition is denied. The Board's order in *Gerawan Farming, Inc.* (2018) 44 ALRB No. 1 is affirmed. The Board and UFW are awarded their costs in this original proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(B).)


                                                                DE SANTOS, J.
WE CONCUR:


DETJEN, Acting P.J.


PEÑA, J.